SMITH CHAPEL BAPTIST CHURCH v. CITY OF DURHAM

[350 N.C. 805 (1999)]

SMITH CHAPEL BAPTIST CHURCH; FELLOWSHIP BAPTIST CHURCH, INC.; LAY-
MAN'S CHAPEL BAPTIST CHURCH; AND CALVARY BAPTIST CHURCH OF
DURHAM, NORTH CAROLINA v. CITY OF DURHAM, A NORTH CAROLINA MUNICIPAL
CORPORATION

No. 250PA97

(Filed 20 August 1999)

**1. Cities and Towns— Stormwater Quality Management Program—funded by utility fees—statutory authority exceeded**

The City of Durham's stormwater utility (SWU) ordinance and the fees charged thereunder were invalid as a matter of law because they exceeded the authority granted to the City through N.C.G.S. §§ 160A-311 and -314(a)(1). It is undisputed that the City's stormwater management program funded by the SWU is a fully comprehensive Stormwater Quality Management Program (SWQMP) with separate component parts, the majority of which are not used to fund and maintain the stormwater and storm sewer drainage systems in place, but to fund an EPA-regulated pollution prevention and control program which includes elements not directed at or used for providing a structural and natural stormwater and drainage system or directed at planning, maintaining, or implementing such facilities. The City choose not to fund the expenditures through the general fund and its SWU ordinance went well beyond the scope of authority granted under N.C.G.S. § 160-311 to construct and operate a structural and natural stormwater and drainage system. The rates, fees, and charges imposed far exceed the costs of providing a structural and natural stormwater drainage system as contemplated by the General Assembly in N.C.G.S. § 160A-314.

**2. Cities and Towns— stormwater drainage—rate scheme— impervious areas**

The rate scheme enacted by the City of Durham pursuant to a stormwater utility (SWU) ordinance was rationally related to the amount of runoff from each lot and was not an arbitrary exercise of the City's statutory authority. Although plaintiffs contended that the fees were illegal in that the impervious area method does not reasonably relate to the stormwater runoff of individual properties and forces consumers to involuntarily pay fees that are not reasonably commensurate with services fur-

nished, N.C.G.S. § 160A-314(a)(1) expressly authorized the City to base the SWU fees on impervious area of the property. It has been held that the test is not whether any particular customer has directly benefitted from the use of a discrete or particular component of the utility plant, but whether the municipal authority has acted arbitrarily in establishing its rates.

**3. Damages and Remedies— stormwater utility fees—invalid—full refund plus interest**

The trial court correctly held that plaintiffs in an action challenging stormwater utility (SWU) fees were entitled to a full refund plus interest where plaintiffs paid the fees under protest and the ordinance and fees were found invalid as a matter of law. A refund of the invalid fees in this action is similar to the common law doctrine of an action for money had and received.

Justice FRYE dissenting.

Chief Justice MITCHELL and Justice PARKER join in this dissenting opinion.

On discretionary review pursuant to N.C.G.S. § 7A-31, prior to a determination by the Court of Appeals, of a judgment entered by Manning, J., on 11 October 1996 and an amended judgment and order entered on 3 January 1997 in Superior Court, Durham County. Heard in the Supreme Court 19 November 1997; opinion filed 30 July 1998, 348 N.C. 632, 502 S.E.2d 364; said opinion superseded by this opinion filed 20 August 1999 upon the allowance of plaintiffs' petition for rehearing pursuant to Rule 31(a) of the North Carolina Rules of Appellate Procedure. Heard in the Supreme Court 8 February 1999.

*Stam, Fordham & Danchi, P.A., by Paul Stam, Jr., and Henry C. Fordham, Jr., for plaintiff-appellants.*

*Office of the City Attorney, by Karen A. Sindelar, Assistant City Attorney, for defendant-appellee.*

*Hunton & Williams, by Charles D. Case; and J. Michael Carpenter, General Counsel, North Carolina Home Builders Association, on behalf of North Carolina Citizens for Business and Industry, North Carolina Pork Council, North Carolina Aggregates Association, and North Carolina Home Builders Association, amici curiae.*

## SMITH CHAPEL BAPTIST CHURCH v. CITY OF DURHAM

[350 N.C. 805 (1999)]

*Ward and Smith, P.A., by Frank H. Sheffield, Jr., on behalf of Chatham County Agribusiness Council, amicus curiae.*

*North Carolina Farm Bureau Federation, by H. Julian Philpott, Jr., General Counsel, and Stephen A. Woodson, Associate General Counsel, amicus curiae.*

*North Carolina League of Municipalities, by Gregory F. Schwitzgebel III, Assistant General Counsel, amicus curiae.*

*City of Charlotte, N.C., by Robert E. Hagemann and Judith A. Starrett, Assistant City Attorneys; and Mecklenburg County, N.C., by Marvin A. Bethune, County Attorney, amici curiae.*

*Cumberland County, N.C., by Garris Neil Yarborough, County Attorney, Grainger R. Barrett, Senior Staff Attorney, and Karen Musgrave, Staff Attorney; and City of Fayetteville, N.C., by Robert Cogswell, City Attorney, amici curiae.*

*Michael F. Easley, Attorney General, by Daniel C. Oakley, Senior Deputy Attorney General, and Jennie Wilhelm Mau, Assistant Attorney General, on behalf of North Carolina Department of Environment and Natural Resources, amicus curiae.*

WAINWRIGHT, Justice.

Stormwater runoff is rain or snowmelt that does not evaporate or penetrate the ground and is collected by storm drains that transport it to receiving waters.

In 1987, the United States Congress enacted an amendment to the Clean Water Act of 1972 (CWA) known as the Water Quality Act (WQA). *See* Water Quality Act of 1987, Pub. L. No. 100-4, 101 Stat. 7 (1987). The WQA represented the first major revision of the CWA since 1977, "clarifying certain areas of the law as well as granting new powers and responsibilities to the U.S. Environmental Protection Agency (EPA) and states." Lawrence R. Liebesman & Elliott P. Laws, *The Water Quality Act of 1987: A Major Step in Assuring the Quality of the Nation's Waters*, 17 Envtl. L. Rep. (Envtl. L. Inst.) 10311, 10312 (Aug. 1987).

The WQA requires, among other things, that cities of 100,000 or more in population obtain a National Pollutant Discharge Elimination System (NPDES) permit in order to discharge stormwater from their municipal storm sewer systems (MS4s) into the nation's waters. *Id.* at

10324; *see* WQA § 405, Pub. L. No. 100-4, 101 Stat. 69 (1994) (codified at 33 U.S.C. § 1342(p)(2)(D)). Any state desiring to administer its own permit program under the WQA may apply for permission to do so with the EPA. CWA § 402(b), Pub. L. No. 92-500, 86 Stat. 880, 880-81 (1972) (codified at 33 U.S.C. § 1342(b)). In 1975, North Carolina received approval from the EPA to administer its own permit program under the CWA and was granted permission to continue this program under the WQA. As such, article 21 of chapter 143 of the North Carolina General Statutes grants the North Carolina Department of Environment and Natural Resources (DENR) (formerly North Carolina Department of Environment, Health and Natural Resources) and the North Carolina Environmental Management Commission (EMC) the authority to administer this program. N.C.G.S. ch. 143, art. 21, pt. 1 (1993) (amended); *see* N.C.G.S. § 143-214.7(a) (authorizing the EMC to "develop and adopt a statewide plan with regard to establishing and enforcing stormwater rules for the purpose of protecting the surface waters of the State").

When Congress enacted the NPDES permitting program, it did not provide the states with funding to support these comprehensive stormwater management programs. N.C.G.S. § 160A-312(a) allows cities and towns to "acquire, construct, establish, enlarge, improve, maintain, own, operate, and contract for the operation of any or all of the public enterprises as defined in this Article to furnish services to the city and its citizens." N.C.G.S. § 160A-312(a) (1994). In an effort to partially support local MS4s, the General Assembly ratified a bill in 1989 titled "An Act to Authorize Local Governments to Construct and Operate Storm Drainage Systems as Public Enterprises and to Provide Local Governments With Funding and Taxing Authority to Finance the Construction and Operation of Storm Drainage Systems." Act of July 15, 1989, ch. 643, 1989 N.C. Sess. Laws 1763. As part of this Act, the General Assembly amended N.C.G.S. § 160A-311 to include in its definition of public enterprises "[s]tructural and natural stormwater and drainage systems of all types." *Id.* at 1770; *see* N.C.G.S. § 160A-311(10) (1994).

Defendant City of Durham (City), in response to the impending NPDES permitting requirements, employed outside consultants to assist in planning and preparing for the requirements that would accompany the NPDES permit application process. These consultants opined that in order to comply with EPA regulations in the NPDES permitting process, the City must develop a comprehensive Stormwater Quality Management Program (SWQMP). Furthermore,

SMITH CHAPEL BAPTIST CHURCH v. CITY OF DURHAM

[350 N.C. 805 (1999)]

the consultants recommended that the SWQMP not be funded through the City's general fund because it "is not a viable source of long-term funding" for the program because political factors constrain the City's willingness to increase property taxes.

On 6 June 1994, the City adopted ordinance number 10183, which created the City's stormwater management program. The ordinance provided for the creation of a stormwater utility (SWU) to finance the stormwater management plan and imposed a utility fee based on the impervious surfaces contained on an individual property. Durham, N.C., Code ch. 23, art. VIII, §§ 23-202, -203 (1994).

On 20 December 1994, plaintiffs filed a complaint in which they challenged the ordinance and the utility fees on several grounds, including the following: (1) the ordinance exceeds the City's enabling authority pursuant to N.C.G.S. §§ 160A-311 and -314, (2) the ordinance violates the express limitation on stormwater fees pursuant to N.C.G.S. § 160A-314(a1), and (3) the ordinance provides for utility fees that are not reasonably commensurate with services furnished. Following a nonjury trial, the trial court entered a judgment on 11 October 1996 in which it concluded that the ordinance and the utility fees were

> invalid as a matter of law in that they [were] operated and conducted in a manner that exceed[ed] the authority granted to the City . . . through [N.C.G.S. §§ 160A-311 and -314(a1)]. As a creature of the legislature, the City . . . may only act within its legislative authority as provided by the General Assembly of North Carolina. The City . . . has stepped far beyond that grant of authority here and the [SWU] Ordinance and fees charged thereby are declared invalid and unenforceable . . . .

On 24 October 1996, the City filed a motion for a new trial or, in the alternative, to amend the trial court's judgment on the ground that the evidence presented at trial was insufficient to support the trial court's conclusions with regard to which of the City's activities were related to stormwater infrastructure. On 26 November 1996, the trial court allowed the motion to reopen the case in order to take additional evidence "in the interest of justice." Thereafter, the trial court entered an amended judgment and order on 3 January 1997 in which it made additional findings of fact and conclusions of law but did not alter or amend its original judgment concluding that the City had operated its SWU in excess of its statutory authority.

The City filed a timely notice of appeal to the Court of Appeals from both the original 11 October 1996 judgment and the amended 3 January 1997 judgment and order. Subsequently, the City filed a petition for discretionary review prior to a determination by the Court of Appeals pursuant to N.C.G.S. § 7A-31, which was allowed by this Court on 23 July 1997. Oral arguments were initially heard in this Court on 19 November 1997, and an opinion was filed on 30 July 1998 in which this Court upheld the City's SWU ordinance on constitutional grounds. *See Smith Chapel Baptist Church v. City of Durham*, 348 N.C. 632, 502 S.E.2d 364 (1998). This Court allowed plaintiffs' petition for rehearing pursuant to Rule 31(a) of the North Carolina Rules of Appellate Procedure on 30 September 1998 and now renders this opinion, which supersedes the previous opinion filed by this Court on 30 July 1998.

On appeal, we are presented with three principal issues: (1) whether the City exceeded its enabling authority by enacting the ordinance and the fees thereunder, (2) whether the impervious area method of calculating the fees is constitutionally permissible, and (3) whether the remedy applied by the trial court was proper.

[1] In deciding the first issue, we note that the City of Durham *chose* to establish a utility as the mechanism by which it would comply with the unfunded mandates of the Water Quality Act of 1987. Municipalities are authorized to establish and operate public enterprises like utilities pursuant to the statutory requirements of N.C.G.S. § 160A-311 and N.C.G.S. § 160A-314, which govern such public enterprises.

N.C.G.S. § 160A-314, which gives authority to fix and enforce rates, provides, in pertinent part:

(a) A city may establish and revise from time to time schedules of rents, rates, fees, charges, and penalties for the *use of* or the *services furnished* by any public enterprise. Schedules of rents, rates, fees, charges, and penalties may vary according to classes of service, and different schedules may be adopted for services provided outside the corporate limits of the city.

(a1) . . . .

The fees established under this subsection must be made applicable throughout the area of the city. Schedules of rates, fees, charges, and penalties for providing *structural and natural stormwater* and *drainage system service* may vary according to

whether the *property served* is residential, commercial, or industrial property, the property's use, the size of the property, the area of impervious surfaces on the property, the quantity and quality of the runoff from the property, the characteristics of the watershed into which stormwater from the property drains, and other factors that affect the stormwater drainage system. Rates, fees, and charges imposed under this subsection *may not exceed the city's cost* of providing a *stormwater* and *drainage system*.

N.C.G.S. § 160A-314(a), (a1), para. 2 (Supp. 1998) (emphasis added).

In determining whether the City's public enterprise complies with the statutes, we first must look to the plain language of the statutes themselves. *State v. Dellinger*, 343 N.C. 93, 95, 468 S.E.2d 218, 220 (1996). "Ordinary rules of grammar apply when ascertaining the meaning of a statute." *Dunn v. Pacific Employers Ins. Co.*, 332 N.C. 129, 134, 418 S.E.2d 645, 648 (1992). "When the language of a statute is clear and unambiguous, there is no room for judicial construction, and the courts must give it its plain and definite meaning." *Lemons v. Old Hickory Council, BSA*, 322 N.C. 271, 276, 367 S.E.2d 655, 658 (1988).

N.C.G.S. § 160A-314 reinforces this statutory construction by providing that the City may establish fees "for the *use of* or the *services furnished* by any public enterprise" and that fees may vary for "structural and natural stormwater and drainage system service" according to the type and size of "property served." N.C.G.S. § 160A-314(a), (a1) (emphasis added). This clear and unambiguous language contemplates only the collection of fees for the "use of" or "furnishing of" stormwater services by the utility.

The General Assembly amended N.C.G.S. § 160A-314 in 1991 to add the following provision: "Rates, fees, and charges imposed under this section *may not exceed* the city's cost of providing a *stormwater* and *drainage system*." N.C.G.S. § 160A-314(a1), para. 2 (emphasis added); *see* Act of July 8, 1991, ch. 591, sec. 1, 1991 N.C. Sess. Laws 1283, 1283-84. This statutory provision clearly and unambiguously mandates that the City may not exceed the cost of providing a stormwater and drainage system. Thus, under a plain reading of the statute, SWU fees are limited to the amount which is necessary for the City to maintain the stormwater and drainage system rather than the amount required to maintain a comprehensive SWQMP to meet the requirements of the WQA.

SMITH CHAPEL BAPTIST CHURCH v. CITY OF DURHAM

[350 N.C. 805 (1999)]

As previously noted, N.C.G.S. § 160A-311 was amended in 1989 by the General Assembly to include in its definition of public enterprises "*structural and natural* stormwater and drainage *systems* of all types." N.C.G.S. § 160A-311(10) (emphasis added). This definition has a plain and clear meaning. The plain meaning is public enterprises, authorized by the applicable statutes, are expressly limited to those systems of physical infrastructure, structural or natural, for servicing stormwater.

While plain language of the statutes is sufficient to determine its meaning, this Court has stated that the title of an act should be considered in ascertaining the intent of the legislature. *State ex rel. Cobey v. Simpson*, 333 N.C. 81, 90, 423 S.E.2d 759, 764 (1992). As previously noted, the act that added the statutory provisions regarding stormwater was titled:

AN ACT TO AUTHORIZE LOCAL GOVERNMENTS TO CONSTRUCT AND OPERATE STORM DRAINAGE SYSTEMS AS PUBLIC ENTERPRISES AND TO PROVIDE LOCAL GOVERNMENTS WITH FUNDING AND TAXING AUTHORITY TO *FINANCE* THE *CONSTRUCTION* AND *OPERATION* OF STORM DRAINAGE *SYSTEMS*.

Act of July 15, 1989, ch. 643, 1989 N.C. Sess. Laws 1763 (emphasis added). The title's focus on "construction and operation" of storm drainage systems demonstrates that the legislature intended such public enterprises to be used solely for the establishment and maintenance of physical systems directly related to stormwater removal and drainage of property.

In determining whether the City's ordinance meets the restrictions cited above, an examination of the ordinance is instructive. The ordinance creates a stormwater utility "to develop and operate the stormwater management program." The ordinance defines the stormwater management program as one that not only includes a stormwater system, but also one that "includes, but is *not limited to* . . . the development of ordinances, policies, technical materials, inspections, monitoring, outreach, and *other activities* related to the control of stormwater quantity and quality." Durham, N.C., Code ch. 23, art. VIII, § 23-201 (1994). Thus, the ordinance on its face exceeds the express limitation of the plain and unambiguous reading of the statute, and the operation of the utility exceeds the statutory authority.

SMITH CHAPEL BAPTIST CHURCH v. CITY OF DURHAM

[350 N.C. 805 (1999)]

As further evidence of the utility exceeding statutory authority, the City created a document containing frequently asked questions with answers, including the following:

**Q: What does Durham plan to do in their [stormwater] management plan?**

A: Durham's [stormwater] management plan addresses preventative maintenance, repair, and replacement of the storm drainage system to control urban flooding. Our [stormwater] management plan also addresses water pollution control. The City will develop *educational programs* that encourage and help citizens and businesses prevent [stormwater] pollution. We will develop *guidance manuals* for construction activities, industrial sites, and related facilities. We will promote and encourage *used oil recycling, household hazardous waste collection programs*, and *reporting* of illegal dumping activities. The City will also test and monitor local runoff and water bodies to see how well our [stormwater] program is doing and to locate areas that need improvement. The City's [stormwater] management plan will strive to meet our current needs, as well as the needs of future generations.

Furthermore, a memorandum from one of the consultants is informative in that it breaks down the line items for operating the SWQMP into "cost centers," including a cost center for stormwater quality management:

A separate cost center has been identified in the cost of service analysis for [stormwater] quality management. Pursuant to the requirements of the NPDES [stormwater] discharge permit, the City's [stormwater] quality management program is expected to begin in fiscal year 1993/1994. It is expected to include a mix of operational, structural, regulatory, and public education components, all intended to reduce pollution of receiving waters due to [stormwater] runoff.

In addition, during the course of the trial, the City introduced an updated stormwater management fund budget report in which it divided expenditures from the stormwater management fund into three separate components: stormwater quality, stormwater quantity, and clean city. A review of these components is instructive.

According to the budget report, the stormwater *quality* component is described as follows:

SMITH CHAPEL BAPTIST CHURCH v. CITY OF DURHAM

[350 N.C. 805 (1999)]

This program provides for the implementation of the City's [SWQMP] approved in the [NPDES] Municipal [Stormwater] Discharge Permit. Program components include industrial and seasonal storm event sampling, identification and correction of illicit connections and illegal dumping, household hazardous waste collection, and development of management programs for commercial, industrial, and residential areas and construction sites.

All funds collected by the utility are placed in one fund, and this fund pays for the City's entire stormwater quality program. The City concedes the utility's activities substantially exceed the providing of stormwater infrastructure. The projected cost for this funding of the stormwater quality component in 1995-96 was $3,686,257 out of a total budget of $5,820,162, and in 1996-97 was $3,751,753 out of a total budget of $6,873,659.

In addition, the stormwater *quantity* component is described in the budget report as follows:

The [Stormwater] Quantity program includes the routine maintenance and repair of the [stormwater] drainage system located in the public rights-of-way and maintenance and improvements to the public drainage system located on private property. This program also includes response to drainage and flooding inquiries from citizens.

As noted, the quantity component even includes drainage and flooding inquiries from citizens. The projected cost for funding the stormwater quantity component in 1995-96 was $2,133,905 out of a total budget of $5,820,162, and in 1996-97 was $2,171,819 out of a total budget of $6,873,659.

Finally, the clean city component is described in the budget report as follows: "This program includes the City's efforts to maintain clean streets and educate the public regarding litter control." The clean city component was not funded in 1995-96, but the projected cost for funding the clean city component in 1996-97 was $950,087 out of a total budget of $6,873,659.

From its description, it appears that little of the program's emphasis is on the maintenance and construction of a structural and natural stormwater and drainage system. The program instead focuses on educational programs, guidance manuals, used oil recy-

cling, household hazardous waste collection, and enforcement efforts against illegal dumping of hazardous materials.

After a careful and thorough review of the record and the evidence presented in this case, it is undisputed that the City's stormwater management program funded by the SWU is a fully comprehensive SWQMP with separate component parts, the majority of which are not used to fund and maintain the stormwater and storm sewer drainage systems in place. The SWU is funding an EPA-regulated pollution prevention and control program. The program includes elements not directed at or used for providing a structural and natural stormwater and drainage system or directed at planning, maintaining, or implementing such facilities. In fact, according to the City's own admission, the program is designed to satisfy the EPA's NPDES permit requirements required by the WQA's demands for pollution control of stormwater discharges into public waters.

Based on the foregoing, it appears clear that, for reasons of expediency, the City *chose* to establish the SWU as a mechanism by which it would comply with the unfunded mandates of the WQA related to stormwater runoff. In addition, the City also *chose* not to fund the expenditures through the general fund. However, in doing so, the City's SWU ordinance went well beyond the scope of authority granted to the City under N.C.G.S. § 160A-311 to construct and operate a structural and natural stormwater and drainage system in that it authorized the operation of a comprehensive SWQMP as envisioned by the EPA and the WQA. Furthermore, the rates, fees, and charges imposed by the City's SWU far exceed the cost of providing a structural and natural stormwater and drainage system to the City's citizens as contemplated by the General Assembly. *See* N.C.G.S. § 160A-314(a1). Therefore, the City's SWU ordinance and the fees charged thereunder are invalid as a matter of law because they are operated and conducted in a manner that exceeds the authority granted to the City through N.C.G.S. §§ 160A-311 and -314(a1).

[2] As to the second issue, this Court has previously held that the establishment of rates for services furnished by a municipality to its citizens "is a proprietary [function] rather than a governmental one, limited only by statute or contractual agreement." *Town of Spring Hope v. Bissette*, 305 N.C. 248, 250-51, 287 S.E.2d 851, 853 (1982). To that end, N.C.G.S. § 160A-314(a) provides as follows:

> (a) A city may establish and revise from time to time schedules of rents, rates, fees, charges, and penalties for the use of or

the services furnished by any public enterprise. Schedules of rents, rates, fees, charges, and penalties may vary according to classes of service, and different schedules may be adopted for services provided outside the corporate limits of the city.

N.C.G.S. § 160A-314(a). According to the Court of Appeals' interpretation of this statute in *Town of Spring Hope*, "[u]nder this broad, unfettered grant of authority, the setting of such rates and charges is a matter for the judgment and discretion of municipal authorities, not to be invalidated by the courts absent some showing of arbitrary or discriminatory action." *Town of Spring Hope v. Bissette*, 53 N.C. App. 210, 212-13, 280 S.E.2d 490, 492 (1981), *aff'd*, 305 N.C. 248, 287 S.E.2d 851 (1982).

As previously noted, N.C.G.S. § 160A-314(a1) provides in pertinent part:

The fees established under this subsection must be made applicable throughout the area of the city. Schedules of rates, fees, charges, and penalties for providing structural and natural stormwater and drainage system service may vary according to whether the property served is residential, commercial, or industrial property, the property's use, the size of the property, the area of impervious surfaces on the property, the quantity and quality of the runoff from the property, the characteristics of the watershed into which stormwater from the property drains, and other factors that affect the stormwater drainage system. Rates, fees, and charges imposed under this subsection may not exceed the city's cost of providing a stormwater and drainage system.

N.C.G.S. § 160A-314(a1), para. 2.

Upon review of this statute, the City enacted ordinance number 10183, which provided for a rate schedule based upon the impervious area, size, and use of the property. According to the ordinance, an "impervious area" is

a surface composed of any material that impedes or prevents natural infiltration of water into the soil, including but not limited to roofs, solid decks, driveways, patios, sidewalks, parking areas, tennis courts, concrete or asphalt streets, or compacted gravel surfaces. Wooden slatted decks and the water area of swimming pools are considered pervious.

Durham, N.C., Code ch. 23, art. VIII, § 23-201. The billing method under the ordinance is as follows:

SMITH CHAPEL BAPTIST CHURCH v. CITY OF DURHAM

[350 N.C. 805 (1999)]

(a.) All developed land in the City, whether public or private, shall be subject to a [stormwater] service charge. Exemptions shall not be allowed based on age, tax exemption, or other status of an individual or organization. Service charges may be subject to a credit system as further provided in this ordinance.

(b) Service charges on all developed land shall begin on July 1, 1994 and shall be computed as follows:

(1) Residential units shall be charged at two rates: $2.17 for residential units with less than 2,000 square feet of impervious surface and $3.25 for residential units with 2,000 square feet or more of impervious surface.

(2) Other residential and nonresidential land shall be charged $3.25 for each equivalent residential unit (ERU). ERUs of less than five-tenths shall be rounded down and those of five-tenths or greater shall be rounded up to the nearest whole number. There will be no service charge for other residential and nonresidential property that contains less than .5 ERU of impervious surface.

Durham, N.C., Code ch. 23, art. VIII, § 23-203. Further, an ERU is defined as "2,400 square feet of impervious surface, which is the average amount of impervious surface on a single family property in the [C]ity." Durham, N.C., Code ch. 23, art. VIII, § 23-201.

Plaintiffs contend the SWU fees are illegal in that the impervious area method does not reasonably relate to the stormwater runoff of individual properties and forces customers to involuntarily pay fees that are not reasonably commensurate with services furnished. However, as the trial court properly noted, the City was completely within its statutory authority when it based the utility fee rates on the impervious area of the property. As our Court of Appeals has noted, "[t]he test is not whether any particular customer has directly benefited from the use of a discrete or particular component of the utility plant, but whether the municipal authority has acted arbitrarily in establishing its rates." *Town of Spring Hope v. Bissette*, 53 N.C. App. at 213, 280 S.E.2d at 493.

We hold that the rate scheme enacted by the City pursuant to the SWU ordinance is rationally related to the amount of runoff from each lot and was not an arbitrary exercise of the City's statutory authority. Furthermore, N.C.G.S. § 160A-314(a1) expressly authorized

the City to base the SWU fees on the impervious area of the property. As such, the trial court correctly concluded that the City's rate scheme was "rational and reasonable." However, as the trial court further noted in its 11 October 1996 judgment, "[t]his finding . . . does not apply to the amount of the stormwater charges that were adopted by the City . . . or the use of the funds collected by the [SWU]."

[3] As to the final issue, we must determine whether the remedy afforded by the trial court was correct. In its decree, the trial court ordered that "plaintiffs in this action, having paid the [SWU] fees under protest, are entitled to a full refund, plus interest, on those fees paid by plaintiffs to the date of this Judgment." As of the date of trial, plaintiff Smith Chapel Baptist Church had paid $22.75 per month to the SWU; plaintiff Fellowship Baptist Church, Inc., had paid $299.00 per month to the SWU; Layman's Chapel Baptist Church had paid $22.75 per month to the SWU; and Calvary Baptist Church of Durham had paid $120.75 per month to the SWU.

A refund of the invalid SWU fees paid by plaintiffs in this action is similar to the common law doctrine of "an action for money had and received." It has been held that this common law action could "be maintained whenever the defendant has money in his hands which belongs to the plaintiff, and which in equity and good conscience he ought to pay to the plaintiff." *Wilson v. Lee*, 211 N.C. 434, 436, 190 S.E. 742, 743 (1937). This Court has stated the common law doctrine as follows:

"Recovery is allowed upon the equitable principle that a person should not be permitted to enrich himself unjustly at the expense of another. Therefore, the crucial question in an action of this kind is, to which party does the money, in equity and good conscience, belong? The right of recovery does not presuppose a wrong by the person who received the money, and the presence of actual fraud is not essential to the right of recovery. The test is not whether the defendant acquired the money honestly and in good faith, but rather, has he the right to retain it. In short, 'the gist of this kind of action is, that the defendant, upon the circumstances of the case, is obliged by the test of natural justice and equity to refund the money.' *Moses v. MacFerlan*, 2 Burrow 1005, 97 Eng. Reprints 676."

*Ridley v. Jim Walter Corp.*, 272 N.C. 673, 677, 158 S.E.2d 869, 872 (1968) (quoting *Allgood v. Wilmington Sav. & Trust Co.*, 242 N.C. 506, 512, 88 S.E.2d 825, 829 (1955)); *see also Wyatt v. Hertz Claim*

*Mgmt. Corp.*, 236 Ga. App. 292, 292-93, 511 S.E.2d 630, 632 (1999); *Conrad v. Evans*, 269 Wis. 387, 392, 69 N.W.2d 478, 481 (1955).

In the instant case, because we have already held that the City's SWU ordinance and the fees charged thereunder are invalid as a matter of law, we further hold that plaintiffs are entitled to a full refund of the illegally collected fees from the City, plus interest on those fees to the date of judgment.

For the reasons stated in this opinion, the trial court's original 11 October 1996 judgment and the amended 3 January 1997 judgment and order are affirmed, and plaintiffs are entitled to a full refund, plus interest, on those fees paid by plaintiffs to the date of judgment.

AFFIRMED.

Justice FRYE dissenting.

I agree with that part of the majority opinion which holds that "the rate scheme enacted by the City pursuant to the SWU [stormwater utility] ordinance is rationally related to the amount of runoff from each lot and was not an arbitrary exercise of the City's statutory authority." I disagree, however, with the majority's conclusion that "the City's SWU ordinance and the fees charged thereunder are invalid as a matter of law because they are operated and conducted in a manner that exceeds the authority granted to the City." I believe that the majority takes an unduly narrow view of the City's authority. Application of the appropriate rule of statutory construction requires us to hold that the applicable public enterprise statutes, N.C.G.S. §§ 160A-311, -312, and -314, are broad enough to authorize the City's SWU ordinance and the expenditure of monies collected thereunder on a "system" for stormwater and drainage collection and transport, including activities that are ancillary to and supportive of the City's physical infrastructure.

For many years, municipalities had the authority to exercise only those powers expressly granted, or those necessarily or fairly implied in or incident to expressly granted powers, or those essential to the accomplishment of the declared objects and purposes of the municipal corporation. *See Homebuilders Ass'n of Charlotte, Inc. v. City of Charlotte*, 336 N.C. 37, 442 S.E.2d 45 (1994) (describing the powers of municipalities as stated by the now-defunct "Dillon's rule"); *see also* N.C.G.S. § 160-1 (repealed effective 1 January 1972).

However, in 1971, the General Assembly enacted a comprehensive revision of the laws governing municipalities, codified in chapter 160A of the North Carolina General Statutes. Act of June 30, 1971, ch. 698, 1971 N.C. Sess. Laws 724; *see also Homebuilders Ass'n of Charlotte*, 336 N.C. at 42, 442 S.E.2d at 49. As part of chapter 160A, the General Assembly enacted the following rule of construction for legislative grants of power to municipalities:

### § 160A-4. Broad construction.

It is the policy of the General Assembly that the cities of this State should have adequate authority to execute the powers, duties, privileges, and immunities conferred upon them by law. To this end, the provisions of this Chapter and of city charters shall be broadly construed and grants of power shall be construed to include any additional and supplementary powers that are reasonably necessary or expedient to carry them into execution and effect: Provided, that the exercise of such additional or supplementary powers shall not be contrary to State or federal law or to the public policy of this State.

N.C.G.S. § 160A-4 (1994). In *Homebuilders Ass'n of Charlotte, Inc. v. City of Charlotte*, this Court interpreted N.C.G.S. § 160A-4 as a legislative mandate "that the provisions of chapter 160A and of city charters *shall* be broadly construed and that grants of power *shall* be construed to include any additional and supplementary powers that are reasonably necessary or expedient to carry them into execution and effect." 336 N.C. at 43-44, 442 S.E.2d at 50.

When the General Assembly, in 1989, amended N.C.G.S. § 160A-311 to include "structural and natural stormwater and drainage systems of all types," it allowed cities to establish and operate stormwater systems as public enterprises. N.C.G.S. § 160A-311(10) (1994); Act of July 15, 1989, ch. 643, sec. 5, 1989 N.C. Sess. Laws 1763, 1769-70. Municipalities are allowed to "acquire, construct, establish, enlarge, improve, maintain, own, operate, and contract for the operation of any or all of the public enterprises as defined in this Article to furnish services to the city and its citizens." N.C.G.S. § 160A-312(a) (1994). Further, municipalities are expressly authorized to fix and enforce rates and fees "for the use of or the services furnished by any public enterprise." N.C.G.S. § 160A-314(a) (Supp. 1998). Specifically, cities may set "rates, fees, charges, and penalties for providing structural and natural stormwater and drainage system service," so long as the fees imposed do not "exceed

SMITH CHAPEL BAPTIST CHURCH v. CITY OF DURHAM

[350 N.C. 805 (1999)]

the city's cost of providing a stormwater and drainage system." N.C.G.S. § 160A-314(a1). These public enterprise statutes, upon which the City relies as enabling authority for its SWU, are a part of chapter 160A, and as such, they are subject to the rule of broad construction mandated by the General Assembly in N.C.G.S. § 160A-4.

The City adopted its SWU ordinance under the authority granted by the General Assembly in the public enterprise statutes. The City operates a structural and natural stormwater and drainage system that must comply with the mandates of the federal NPDES (National Pollutant Discharge Elimination System) permitting requirements. Compliance with federal NPDES regulations is a duty of the City and of other affected municipalities. Any ambiguity in the meaning of the term "stormwater and drainage *system*" must be resolved in favor of enabling municipalities to execute the duties imposed upon them by federal law concerning the discharge of stormwater. The City cannot operate a stormwater and drainage system without complying with federal regulations. Certainly, N.C.G.S. § 160A-4 and *Homebuilders Ass'n of Charlotte* require us to interpret the applicable public enterprise statutes broadly enough to encompass the City's operation of its SWU and collection of fees under the SWU ordinance as "reasonably necessary or expedient" to its expressly granted powers. I would uphold the City's SWU ordinance and the fees charged thereunder as a valid exercise of the City's authority granted by N.C.G.S. §§ 160A-311, -312, and -314.

Chief Justice MITCHELL and Justice PARKER join in this dissenting opinion.