BELLSOUTH TELECOMMUNICATIONS, INC., PLAINTIFF v. CITY OF LAURINBURG, A NORTH CAROLINA MUNICIPAL CORPORATION, AND SCHOOL LINK, INC., A NORTH CAROLINA CORPORATION, DEFENDANTS

No. COA04-145

(Filed 18 January 2005)

**Cities and Towns— public enterprises—cable television system—fiber optic network—extent of municipal authority**

Summary judgment for defendants was affirmed in an action seeking a permanent injunction and declaratory judgment against defendants' operation of a fiber optics network, based on allegations that the network was beyond Laurinburg's statutory authority. North Carolina cities have the statutory authority to operate certain public enterprises, including cable television systems, and statutes are to be construed in favor of the municipality when there is an ambiguity.

Appeal by plaintiff from judgment entered 11 July 2003 by Judge B. Craig Ellis in Scotland County Superior Court. Heard in the Court of Appeals 13 October 2004.

*Hunton & Williams, L.L.P., by Edward S. Finely and Christopher J. Ayers, for plaintiff appellant.*

*Tharrington Smith, L.L.P., by Michael Crowell, for defendant appellee City of Laurinburg; and Gordon, Horne, Hicks & Floyd, P.A., by Charles L. Hicks, Jr., for City of Laurinburg defendant appellee.*

*Mitchell, Brewer, Richardson, Adams, Burge & Boughman, by Ronnie M. Mitchell and Coy E. Brewer, for School Link, Inc., defendant appellee.*

McCULLOUGH, Judge.

Plaintiff appellant, BellSouth Telecommunications, Inc. ("BellSouth" or "plaintiff") filed a verified complaint against the City of Laurinburg ("Laurinburg") and School Link, Inc. ("School Link") (collectively "defendants") on 25 July 2002. School Link filed a motion for summary judgment dated 22 May 2003, and BellSouth and Laurinburg filed separate motions for summary judgment dated 23 May 2003. The trial court granted summary judgment in favor of Laurinburg and School Link on 11 July 2003.

This appeal from the trial court's order arises from the following facts and circumstances: BellSouth is a Georgia corporation licensed to do business in North Carolina, and is a public utility subject to the North Carolina's Utilities Commission ("Utilities Commission"). Pursuant to Chapter 62 of North Carolina's General Statutes and its Certificate of Public Convenience and Necessity issued by the Utilities Commission, BellSouth is authorized to "convey[] or transmit[] messages or communications by telephone or telegraph, or any other means of transmission, where such service is offered to the public for compensation." N.C. Gen. Stat. § 62-3(23)(a)(6) (2003). BellSouth provides Digital Subscriber Line (DSL) high speed Internet service, and is an Internet Service Provider (ISP) over these lines. Laurinburg is a city in Scotland County and is a North Carolina municipal corporation as defined under N.C. Gen. Stat. § 160A, *et seq.* (2003). School Link is a North Carolina Corporation which, as an ISP, provides Internet services in Scotland County.

Sometime in 1996, Laurinburg laid a twelve (12) strand fiber optic network consisting of multi-mode cable for the purposes of providing electronic communication services between its city hall and the Laurinburg public works building ("LPW"). In 1998, the multi-mode

BELLSOUTH TELECOMMS., INC. v. CITY OF LAURINBURG

[168 N.C. App. 75 (2005)]

cable was replaced with single-mode fiber optic cable in what amounted to a nineteen (19) mile loop, with an increase in the number of fiber optic strands from twelve (12) to thirty-six (36). Laurinburg believed this would provide sufficient capacity for its known present needs as well as future required information capacity to meet needs not yet foreseeable in light of changing technology.

From approximately 1998 to 2000, the Electronic Community Resource Center (ECRC), a defense contractor, was connected to the network between its office in downtown Laurinburg and a training room leased by it at St. Andrews College ("St. Andrews"). Though ECRC went out of business in 2000, the fiber used for that connection was left in place.

In late spring or early summer of 2000, School Link became a party to the network as its ISP pursuant to a lease with Laurinburg. Because School Link needed a certain volume of business to make its link to Laurinburg financially feasible, the lease discussions included representatives from School Link, Laurinburg, the Scotland County government, the Scotland County schools, St. Andrews College, and the Scotland Memorial Hospital ("Scotland Memorial"). The Laurinburg City Council approved a lease to School Link following a 21 August 2000 public hearing. School Link was to provide the network with internet services including Bandwidth, Mail, Domain Name System (DNS), and web-hosting.

Using the necessary hardware, Laurinburg serviced the rest of the city government, and additionally the non-city users, to the network by routing the network traffic onto the users' property by way of City utility poles. The first non-city users connected were Scotland County school buildings, two (2) of which were connected in October 2000, and the remaining seven (7) in March of 2001. In early to mid-2001, three Scotland County government buildings were connected. St. Andrews was connected in September of 2001, and Scotland Memorial was connected in November or early December of 2001. Each of the users used two (2) strands of the fiber optic network.

The hardware components for running the network included the following: The city loop consists of one Cisco 3548 switch, one Cisco 7200 router, five Cisco 3524's (two used as backup), eight single-mode fiber converters, and eight two gigabit fiber connections. The Scotland County government loop consists of six single-mode fiber converters and one hub, three converters located in the LPW with a hub, and one fiber converter at the county administration building,

BELLSOUTH TELECOMMS., INC. v. CITY OF LAURINBURG

[168 N.C. App. 75 (2005)]

Emergency Medical Services (EMS), and the county library. The Scotland County school loop consists of 18 single-mode fiber converters and eight hubs located at six schools, the school administration building, and LPW. Scotland Memorial is fed by two single mode fiber converters, one at LPW and the other at the hospital. St. Andrews is fed by two single mode fiber converters, one at LPW and the other St. Andrews. School Link's connection is through an interface at LPW with the Laurinburg network, where School Link leases space on a rack holding their own router and equipment. This allows School Link to connect its outside lines to the fiber optic network.

Laurinburg receives $350 per connection per month from each connected user. Payments from the county schools and library differ in that these users pay their fees directly to School Link minus the fees subsidized through E-Rate funding (a federal program that provides grants to entities in rural areas, which funds the substantial majority of the connection fees for the library and the schools.) School Link then forwards to the city the total amount of the connection fees charged by the city for the schools, $2,800, and the library, $350. School Link pays an additional $2,000 per month for the space of their router on the rack at LPW. Currently, Laurinburg's fiber optics network is being used solely for the purpose of data transmission, and those internet services provided by School Link. Laurinburg has not yet sought to provide cable television programming, and despite the current large amount of excess capacity on the network (approximately 24 strands), it claims that it would have to purchase additional fiber to do so.

BellSouth owns and operates utility poles throughout Laurinburg to transmit telephone services. Since the 1930's, BellSouth has leased from Laurinburg access to its utility poles for such service. Laurinburg has likewise leased from BellSouth access to BellSouth's utility poles to transmit data services.

Before the Laurinburg network was in place and providing an ISP service with School Link, BellSouth provided internet service to Scotland County schools by running a T-1 line to the schools' central office which was the hub for the schools. Those schools, now serviced by Laurinburg and School Link, were at one time serviced by BellSouth over the Laurinburg network. All of those schools out of the reach of the Laurinburg network remain on lines connecting them to the schools' central office, and thus to School Link, on BellSouth's network. Before St. Andrews was a part of the Laurinburg network and with School Link as its ISP, BellSouth provided internet service

over a T1 line that connected St. Andrews to the University of North Carolina at Pembroke. Before Scotland County's three buildings were connected to the Laurinburg network with School Link as its ISP, Carolina Online was its ISP. With one exception, all Scotland County users were using a "dial-up" connection over regular telephone lines owned and maintained by BellSouth. The Scotland County Department of Social Services was connected through a T1 line provided by the North Carolina Cooperative Extension Office. After the county buildings had connected to the Laurinburg network, the county turned down BellSouth's offer to provide DSL service.

In their complaint, BellSouth sought a permanent injunction and declaratory judgment, alleging the following grounds for their relief: That Laurinburg fiber optics network was being operated as a "public enterprise" beyond a municipality's authority to do so under N.C. Gen. Stat. § 160A-311 (2003); and that the contract made with School Link to service non-city users over the network was therefore *ultra vires*. In response to this complaint, and at differing stages of the litigation, Laurinburg and School Link offered a host of legal authority permitting the municipality's operation of their fiber optic network and their agreement with School Link. *See* N.C. Gen. Stat. § 160A-272 (2003) (lease of excess property); N.C. Gen. Stat. §§ 160A-460 through -464 (2003) ("interlocal" agreements); N.C. Gen. Stat. § 160A-311(7) (acting as a public enterprise "cable television systems"); and N.C. Gen. Stat. § 158-7.1 (2003) (allowing for "local development" appropriations).

In reaching our holding on the merits of the case at bar, our analysis addresses two significant issues. The first, which affects the second, is a question of which tools of legal construction are to be implemented in our reading of statutes authorizing municipal powers. And second, when applying the correct tools, do the actions taken by Laurinburg in establishing their fiber optics network fall within one of its authorized powers as a municipality. Based on our analysis set out herein, we affirm the trial court's grant of summary judgment in favor of Laurinburg and School Link on the basis that the municipality is operating what is by North Carolina statutory definition, a "cable television system." *See* N.C. Gen. Stat. § 160A-319(2003). As such, Laurinburg has authority to engage in this "public enterprise" and contract with School Link for its ISP services. N.C. Gen. Stat. § 160A-311(7). We do not, and need not, address those alternative theories offered by Laurinburg as authority for their fiber optics network.

## I.  Standard of Review/Legal Construction of Chapter 160A

On appeal from an order granting summary judgment, we review the record in a light most favorable to the party against whom the order has been entered to determine whether there exists a genuine issue as to any material fact. *Oliver v. Roberts*, 49 N.C. App. 311, 314, 271 S.E.2d 399, 401 (1980), *cert. denied*, 276 S.E.2d 283 (1981). Where no such issue of fact exists and summary judgment is proper, we review the trial court's ruling on the motion for summary judgment *de novo* because its basis is found solely in law. *Coastal Plains Utils., Inc. v. New Hanover County*, 166 N.C. App. 333, 340-41, 601 S.E.2d 915, 920 (2004).

The undisputed facts of this case implicate the municipal powers granted to a city authorized under Chapter 160A of the North Carolina General Statutes. "It is a well-established principle that municipalities, as creatures of statute, can exercise only that power which the legislature has conferred upon them." *Bowers v. City of High Point*, 339 N.C. 413, 417, 451 S.E.2d 284, 287 (1994); *Homebuilders Assn. of Charlotte v. City of Charlotte*, 336 N.C. 37, 41-42, 442 S.E.2d 45, 49 (1994). In setting out these exclusive and limited municipal powers, the legislature has mandated the following:

### § 160A-4. Broad construction

It is the policy of the General Assembly that the cities of this State should have adequate authority to execute the powers, duties, privileges, and immunities conferred upon them by law. To this end, the provisions of this Chapter and of city charters *shall be broadly construed and grants of power shall be construed to include any additional and supplementary powers that are reasonably necessary or expedient to carry them into execution and effect*: Provided, that the exercise of such additional or supplementary powers shall not be contrary to State or federal law or to the public policy of this State.

N.C. Gen. Stat. § 160A-4(2003) (emphasis added). N.C. Gen. Stat. § 160A-4 was a part of a 1971 revision of the North Carolina statutes governing municipalities. 1971 N.C. Sess. Laws ch. 698. In *Homebuilders*, the Supreme Court squarely addressed the issue of statutory construction under rule N.C. Gen. Stat. § 160A-4, stating:

This statute makes it clear that the provisions of chapter 160A and of city charters shall be broadly construed and that grants of power shall be construed to include any additional and

supplementary powers that are reasonably necessary or expedient to carry them into execution and effect.

*Homebuilder's Assn. of Charlotte*, 336 N.C. at 43-44, 442 S.E.2d at 49-50 (where the Court applied this statute to uphold the assessment of regulatory fees assessed by the city for its related and clearly authorized regulatory activities). In its reading of N.C. Gen. Stat. § 160A-4, the Court found that the narrow rule of construction established over some 100 years prior by common law, known as "Dillon's Rule," had been replaced by the legislature's 1971 enactment. *Id.*; *see, e.g., Smith v. Newbern*, 70 N.C. 14 (1874), *modified*, 73 N.C. 303 (1875). Dillon's Rule, set out in a treatise on municipal law by Judge John S. Dillon, stated:

> [A] municipal corporation possesses and can exercise the following powers and no others: First, those granted in express words; second, those necessarily or fairly implied in or incident to the powers expressly granted; third, those essential to the accomplishment of the declared objects and purposes of the corporation,—not simply convenient, but indispensable.

*Dillon, Commentaries on the Law of Municipal Corporations*, § 237 (5th ed. 1911). The Court in *Homebuilders* goes out of its way to distinguish two of its holdings applying Dillon's Rule after the enactment of N.C. Gen. Stat. § 160A-4. *See Builders, Inc. v. City of Winston-Salem*, 302 N.C. 550, 276 S.E.2d 443 (1981); *Greene v. City of Winston-Salem*, 287 N.C. 66, 213 S.E.2d 231 (1975). The Court stated:

> In neither case was N.C.G.S. § 160A-4 discussed or cited by the Court and the issue of the interplay between Dillon's Rule of construction and N.C.G.S. § 160A-4 was, therefore, not addressed. Thus, we do not consider *Porsh* and *Greene* as determinative on the issue squarely presented in the instant case: the proper rule of construction of grants of powers to municipalities in light of N.C.G.S. § 160A-4.

*Homebuilders Assn. of Charlotte*, 336 N.C. at 45, 442 S.E.2d at 50.

In the same year the opinion in *Homebuilders* was rendered, the Supreme Court decided *Bowers v. City of High Point*, 339 N.C. 413, 451 S.E.2d 284 (1994). In *Bowers*, the Court allowed the city to void a contract as being *ultra vires*, stating that the city was correct in asserting that it did not have statutory authority to contract to pay a separation allowance to early-retired police officers based on anything beyond their "base rate of compensation" as set out in N.C. Gen.

Stat. § 143-166.41(A) (1993). *Bowers,* 339 N.C. at 420, 451 S.E.2d at 289. The Court concluded the city lacked statutory power to interpret what the "base rate" included. *Id.* While the Court seemed to resuscitate "Dillon's Rule" by restating it at the beginning of its analysis, the holding of the Court hinged on the following plain meaning analysis:

> Although we are unable to set forth any rule which easily and conclusively determines what forms of compensation are to be included in "base rate of compensation," we are satisfied that the plain meaning of "base rate of compensation" does not include overtime pay, longevity pay, or pay for unused accrued vacation. "Base pay" is defined as "wages, *exclusive of overtime, bonuses, etc.*"

*Id.* (quoting *Black's Law Dictionary* 157 (6th ed. 1990)). Most recently, without citing either Dillon's Rule, N.C. Gen. Stat. § 160-4, *Homebuilders,* or *Bowers,* the Supreme Court utilized the plain meaning rule again to strike down the City of Durham's Storm Water Quality Management Program ("SWQMP") and fees assessed thereunder. *Smith Chapel Baptist Church v. City of Durham,* 350 N.C. 805, 517 S.E.2d 874 (1999) ("*Smith Chapel*"). The Court in *Smith Chapel* found that under the plain meaning of N.C. Gen. Stat. § 160A-311(10) (1998) (authorizing a municipality to operate as a public enterprise "stormwater and drainage systems of all types") and N.C. Gen. Stat. § 160A-314(a), (a1) (1998), Durham had authority to run a stormwater management public enterprise for compensation, but "limited to those systems of physical infrastructure, structural or natural, for servicing stormwater." *Smith Chapel Baptist,* 350 N.C. at 812, 517 S.E.2d at 879. Therefore, because much of Durham's SWQMP and related fees were not related to the physical stormwater system (such as education programing), the program was found to function as an unauthorized public enterprise and was struck down. In his dissent writing for three Justices, Justice Frye applied N.C. Gen. Stat. § 160A-4 and *Homebuilders* for the minority opinion's belief that there was some ambiguity in the language of " 'stormwater and drainage *system*' " that should have been resolved in favor of enabling Durham to execute their authorized public enterprise. *Id.* at 821, 517 S.E.2d at 884.

Though not without nuances and distinguishing factors, we find *Homebuilders, Bowers,* and *Smith Chapel* to be consistent statements of the law and in accord with N.C. Gen. Stat. § 160A-4. The narrow Dillon's Rule of statutory construction used when interpreting municipal powers has been replaced by N.C. Gen. Stat. § 160A-4's

mandate that the language of Chapter 160A be construed in favor of extending powers to a municipality where there is an ambiguity in the authorizing language, or the powers clearly authorized reasonably necessitate *"additional and supplementary powers" "to carry them into execution and effect*[.]" N.C. Gen. Stat. § 160A-4 (emphasis added); *see Homebuilders Assn. of Charlotte*, 336 N.C. at 45, 442 S.E.2d at 50. However, where the plain meaning of the statute is without ambiguity, it "must be enforced as written." *Bowers*, 339 N.C. at 419-20, 451 S.E.2d at 289; *see also, Smith Chapel Baptist*, 350 N.C. at 812, 517 S.E.2d at 879.

## II. "Cable Television System"/Fiber Optics Network

Turning to the merits of the case. Among the legal rationales offered by Laurinburg for the operation of its fiber optics network is that it is a "[c]able television system[]" ("CTS") authorized to be owned and operated as a public enterprise. N.C. Gen. Stat. § 160A-311(7). We agree.

### A.  CTS Defined

In North Carolina, a city has authority to operate any or all of the ten "public enterprise[s]" set out in N.C. Gen. Stat. § 160A-311, one of which being a CTS. N.C. Gen. Stat. § 160A-311(7). Included in this authority is the following:

> A city shall have authority to acquire, construct, establish, enlarge, improve, maintain, own, operate, and contract for the operation of any or all of the public enterprises as defined in this Article to furnish services to the city and its citizens.

N.C. Gen. Stat. § 160A-312 (2003).

Laurinburg claims the operation of its fiber optics network falls within its authority to operate a CTS, where a CTS is defined as follows:

> (b) For the purposes of this section, "cable television system" means *any system or facility that,* by means of a master antenna and wires or cables, *or by wires or cables alone, receives,* amplifies, modifies, *transmits,* or distributes any television, radio, or *electronic signal, audio or video or both,* to subscribing members of the public for compensation.

N.C. Gen. Stat. § 160A-319(b) (emphasis added). BellSouth claims that this definition pertains only to N.C. Gen. Stat. § 160A-319, a

statute which authorizes and sets time limits for a municipality's authority to franchise utilities. Instead, BellSouth argues the applicable definition is that of a "cable system" as set out in the Cable Communications Policy Act of 1984:

> (7) [A] facility, consisting of a set of closed transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community, but such term does not include . . . (C) a facility of a common carrier which is subject, in whole or in part, to the provisions of subchapter II of this chapter [47 USCS §§ 201, et seq.], except that such facility shall be considered a cable system (other than for purposes of section 541(c)) of this title [47 USCS § 541(c)] to the extent such facility is used in the transmission of video programming directly to subscribers, unless the extent of such use is solely to provide interactive on-demand services[.]

47 U.S.C. § 522(7) (2002).

We do not read the definition of CTS to be confined to N.C. Gen. Stat. § 160A-319, rather, we believe this clearly represents the legislature's intended definition for CTS as used in N.C. Gen. Stat. § 160A-311(7). The first sentence of N.C. Gen. Stat. § 160A-319(a) states that

> [a] city shall have authority to grant upon reasonable terms franchises for the operation within the city of any of the enterprises listed in G.S. 160A-311 and for the operation of telephone systems.

N.C. Gen. Stat. § 160A-319(b) explicitly refers to the term CTS as used in the public enterprises statute to define the contours of what a municipality may franchise as a CTS. Additionally, N.C. Gen. Stat. § 160A-319, as first enacted under N.C. Gen. Stat. § 160-2 (effective 4 July 1967), was added to the General Statutes before there was any clear authority that a city could operate its own CTS as a "public enterprise." 1967 Session Laws ch. 100, § 2, ch. 1122, § 1. Had the legislature intended CTS to take on a different meaning when enacting N.C. Gen. Stat. § 160A-311 in 1971, and recodifying N.C. Gen. Stat. § 160-2 into N.C. Gen. Stat. § 160A-319 the same year, we believe they would have done so. *See* Session Laws 1971, Ch. 698. Lastly, without more, we can find no logical reason, nor has one been offered, why

the legislature would desire CTS be defined as something different when operated as a public enterprise by the City than that definition used when a City is granting a franchise of the same.

Therefore, for the purpose of defining CTS in N.C. Gen. Stat. § 160A-311(7), we look to N.C. Gen. Stat. § 160A-319(b) and not the federal code. We note that the federal definition of "cable system" is relevant to the issue of *how* the system will be regulated under the federal code, but offers little guidance as to whether municipalities in North Carolina have *statutory authority* to operate those as a system or network falling within its definition of CTS as a public enterprise.[1]

*B. Laurinburg's Network is a CTS*

We next consider whether services offered by Laurinburg over their fiber optic network fall within the plain meaning of N.C. Gen. Stat. § 160A-319(b). Restating that statute in part, a CTS is

*any system or facility* that, by means of . . . wires or cables alone, receives, amplifies, modifies, transmits, or distributes any television, radio, or *electronic signal, audio or video or both,* to subscribing members of the public for compensation.

---

1. There is a line of federal cases touching on the issue of what is and is not a "cable system" under the federal code and for purposes of Federal Communications Commission (FCC) regulations. These cases vary in their conclusions, representing a clear ambiguity under federal law of what is a "cable system" in light of today's bundled technology. *See AT&T v. City of Portland*, 216 F.3d 871, 876-80 (9th Cir. 2000) (The court concluded transmission of internet service over cable broadband facilities is a telecommunication service for purposes of regulation: "Surfing cable channels is one thing; surfing the Internet over a cable broadband connection is quite another"); *MediaOne Group, Inc. v. County of Henrico*, 257 F.3d 356, 365 (4th Cir. 2001) ("We do not have to reach the question of whether MediaOne's bundled Road Runner service is a cable service, a telecommunications service, or an information service"); *Nat'l Cable & Telecom v. Gulf Power*, 534 U.S. 327, 151 L. Ed. 2d 794, (2002) (In interpreting the federal Pole Attachments Act, 47 U.S.C. § 224, Justice Kennedy writing for a majority applied the plain meaning rule in stating that, "even if a cable television system is only a cable television system to the extent it provides cable television, an "attachment . . . by a cable television system" is still (entirely) an attachment "by" a cable television system whether or not it does other things as well"); *In the Matter of Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities; Internet Over Cable Declaratory Ruling; Appropriate Regulatory Treatment for Broadband Access to the Internet Over Cable Facilities*, 17 FCC Rcd 4798, 4802(2002) (Where the FCC concluded that a "cable modem service, as it is currently offered, is properly classified as an interstate information service, not as a cable service, and that there is no separate offering of telecommunications service"); and *Brand X Internet Servs. v. FCC*, 345 F.3d 1120, 1132 (9th Cir. 2003) (The Court overruled the FCC's declaratory ruling in part, holding that cable broadband service was not a "cable service" but instead was part "telecommunications service" and part "information service.").

*Id.* (emphasis added). The statute in no way limits CTS to a specified type of wire or cable, such as coaxial cable, copper T1 lines, or fiber optic lines. Nor does it limit the transmission or reception of electronic signals to any specific content. Thus, in reading this statute, we cannot say that its plain meaning clearly forecloses the statutory authority of Laurinburg to operate its fiber optic network. *See Bowers*, 339 N.C. at 417, 451 S.E.2d at 287; *Smith Chapel Baptist*, 350 N.C. at 812, 517 S.E.2d at 879. Stated differently, the language of this statute is ambiguous as to whether the fiber optic network run by Laurinburg falls within its contours. Thus, we apply N.C. Gen. Stat. § 160A-4's broad rule of construction.

Laurinburg's network is run over fiber optic "wires or cable," providing a *"system"* for "transmit[ting]" and "receiv[ing]" electronic signals capable of being converted to "audio" and/or "video" streams of information. *See* N.C. Gen. Stat. § 160A-319(b). We believe this fits within a broad construction of the definition of a CTS. Therefore, we hold that Laurinburg is acting within its municipal authority to run its network, and was not acting *ultra vires* in contracting with School Link to provide the network's ISP service.[2]

We acknowledge that Laurinburg's fiber optics network was most likely not something the legislature envisioned in 1971 when they enacted the statute allowing a municipality to operate a CTS as a public enterprise. However, if Laurinburg were currently offering the kind of cable programming in place in 1971, and doing so over their fiber optic network, they clearly would be authorized to offer the current bundle of network services over these same lines as "additional and supplementary *powers that are reasonably necessary or expedient."* N.C. Gen. Stat. § 160A-4. Without authority to offer the bundled CTS services, no municipality could effectively operate in today's market.[3] Moreover, just as BellSouth is able to leverage its telephone infrastructure to provide low cost DSL broadband services in the market, so too should a municipality be able to leverage its CTS infrastructure. We believe it would elevate form over function, against the intent of our legislature's mandate for broad construction, to first demand 1971-type cable programming be in place before a 2004 CTS could be authorized as a public enterprise. Rather, the legislature's intent in 1971 was to enable the municipality's public enterprise to grow in reasonable stride with technological

2. The record indicates that Laurinburg has offered BellSouth the opportunity to offer its ISP services over the fiber optics network.

3. Cable modem service provides high-speed access to the Internet . . . [t]he service is available to approximately 73% of U.S. households. 17 FCC Rcd 4798, 4799-4800.

advancements, as it is this advancement which marks the ever-approaching horizon of necessity.

Based upon the record, appendices, exhibits, and briefs, we uphold the trial court's grant of summary judgment in favor of Laurinburg and School Link.

Affirmed.

Judges McGEE and ELMORE concur.