IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-1087

Filed: 31 December 2020

Columbus County, Nos. 16CRS001248-49

STATE OF NORTH CAROLINA

      v.

RILEY DAWSON CONNER, Defendant.

Appeal by Defendant from judgments entered 21 February 2019 by Judge Michael A. Stone in Superior Court, Columbus County. Heard in the Court of Appeals 25 August 2020.

> *Attorney General Joshua H. Stein, by Assistant Attorney General Kimberly N. Callahan, for the State.*
>
> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender Andrew DeSimone, for the Defendant.*

DILLON, Judge.

Fifteen-year-old Riley Dawson Conner ("Defendant") pleaded guilty to the rape and murder of his paternal aunt. Defendant was sentenced on 21 February 2019 to 240 to 348 months imprisonment for rape and, following a hearing pursuant to N.C. Gen. Stat. § 15A-1340.19A, *et seq.* and *Miller v. Alabama*, 567 U.S. 460 (2012), was sentenced to a consecutive sentence of life with parole for murder. Under the terms of Defendant's sentences, he will not be eligible for parole for at least 45 years and has no opportunity for release until at least age 60. The trial court further ordered

Defendant's enrollment in lifetime satellite-based monitoring ("SBM") without holding a hearing on the issue. Defendant appeals.

## I. Argument

Defendant makes three arguments on appeal: (1) his consecutive sentences are not permitted under N.C. Gen. Stat. § 15A-1340.19A, *et seq.* (the "*Miller*-fix statutes"); (2) these sentences are the functional equivalent of life without parole ("LWOP") and are thus unconstitutional when imposed on a redeemable juvenile under the Eighth Amendment to the United States Constitution and Article I, Section 27 of the North Carolina Constitution; and (3) the trial court erred in imposing lifetime SBM without a hearing. We address Defendant's three arguments in turn.

Regarding Defendant's first argument, we hold that consecutive sentences for multiple crimes are generally permissible under Section 15A-1340.19A. There is nothing in that statute which states that such sentences are generally not permissible.

Section 15A-1354, though, states that when "multiple sentences of imprisonment are imposed on a person at the same time" the trial court has discretion to determine whether those sentences are to run consecutively or concurrently. N.C. Gen. Stat. § 15A-1354 (2019). Accordingly, this argument is overruled.

Regarding Defendant's second argument, we hold that the sentences are not unconstitutional. We recognized that our Court recently held an identical sentence

unconstitutional on these grounds in *State v. Kelliher*, ___ N.C. App. ___, 849 S.E.2d 333 (2020). However, our Supreme Court has stayed *Kelliher* and granted discretionary review of that decision. Accordingly, *Kelliher* is not binding on our Court.

*Miller* has never held as being unconstitutional a life *with* parole sentence imposed on a defendant who commits a murder when he was a minor. Here, Defendant will be eligible for parole when he is 60 years old. Assuming that a *de facto* LWOP sentence (where a defendant is sentenced to consecutive terms for multiple felonies) is unconstitutional, we hold that based on the evidence before the trial court a 45-year sentence imposed on this 15-year old does not equate to a *de facto* life sentence. Our General Statutes recognize that the life expectancy for a 15-year old is 61.7 years. N.C. Gen. Stat. § 8-46 (2019).

Regarding Defendant's third argument, we agree and vacate the trial court's order imposing SBM and remand this issue for a new hearing.

## II. Conclusion

We affirm the judgment sentencing Defendant to consecutive terms. The imposition of consecutive sentences is allowed when minors are sentenced under Section 15A-1390B. And the consecutive sentences imposed by the trial court was not unconstitutional. However, we vacate the SBM order and remand for a hearing

on the matter that complies with the statutory procedure in N.C. Gen. Stat. § 14-208.40A.

AFFIRMED IN PART, VACATED AND REMANDED IN PART.

Judge MURPHY concurs.

Chief Judge McGEE dissents by separate opinion.

McGEE, Chief Judge, concurring in part and dissenting in part.

I agree with the majority that N.C. Gen. Stat. §§ 15A-1340.19A, *et seq.* (the "*Miller*-fix statutes") do not prohibit consecutive sentences as a statutory matter, and I agree that Defendant's SBM order should be vacated and remanded. However, because I would hold that Defendant's sentences constitute a *de facto* life without parole ("LWOP") punishment prohibited by our state and federal constitutions following the analysis conducted in *State v. Kelliher*, ___ N.C. App. ___, 849 S.E.2d 333, *temp. stay allowed*, ___ N.C. ___, 848 S.E.2d 493 (2020), I respectfully dissent.

## I. <u>FACTUAL AND PROCEDURAL HISTORY</u>

Although I would dispense of this appeal consistent with *Kelliher*, Defendant's punishment does differ from the one held unconstitutional in that case, and the individual facts leading to Defendant's convictions, sentencing, and resentencing are unique. Those particular details are recited below to describe Defendant's specific circumstances and provide relevant context not included in the majority.

### A. *Defendant's Early Life*

Defendant was born in 2000 and lived with his mother in a home near Tabor City, North Carolina, for the first four years of his life. Defendant and his parents later moved in together in a home on Savannah Road, a street so known for its illegal activity that Defendant's maternal aunt, Kimberly Gore, called it "the pits of hell." As Defendant's mother would later describe Savannah Road, "[i]t's nowhere for a child to be. . . . Because there's nothing but drugs down there and witnessing

[prostitution] . . . drugs everywhere, [and] drinking. [Defendant] really didn't need to be down there and if I could go back . . . I'd change it." In describing how she would change her care of Defendant, she stated only that she "would have never started smoking crack and . . . would have never let him went [sic] down that dirt road ever."

Both of Defendant's parents were heavily involved in illegal drugs and criminal activities during his early formative years. As previously suggested, his mother was addicted to crack, while his father dealt marijuana with his brother-in-law. When Defendant was about four years old, he witnessed a police raid on his Savannah Road home and the arrest of his father and uncle. It was the first of several times that Defendant would watch his father get arrested in front of him. Defendant next moved in with Ms. Gore, his maternal aunt, asking her "why didn't you come get me? I was scared. Where were you?" Defendant ceased living with his mother, who testified she was out "[r]unning the roads, getting in trouble. . . . [C]rack t[ook] over [her] whole life and that was all [she] was worried about was going to get the next hit."

Defendant's parents had another child, Layla, in June of 2004. His father borrowed a van to pick Defendant's mother and Layla up from the hospital, but he never showed up; instead, he drove the van through the front windows of a convenience store to steal cigarettes and a jar of money because, according to Ms. Gore, "drugs were more important [to Defendant's parents than] [Defendant] and Layla." When Layla was a few months old, Defendant's parents took Defendant and

Layla to a crack house, prompting Ms. Gore to call the Department of Social Services. Defendant's maternal grandparents then took custody of Defendant and Layla.

Defendant rarely saw his parents while living with his grandparents. His mother promised to attend Defendant's birthday parties over the next several years, but only showed up once or twice. On one of those visits, Defendant begged his mother to stay with him; when she did not, Defendant chased her car down the road shouting "I hate you, I hate you." Ms. Gore and Defendant's grandparents would buy Christmas gifts for Defendant but, on two occasions, his parents stole the gifts and sold them for drugs. Defendant's father continued his life of crime, which included robbing a bank and other acts of larceny. He involved Defendant's mother in one of these offenses, employing her as a getaway driver; Defendant's father was incarcerated for seven years as a result, while his mother received probation. Ultimately, she also served time in prison because, per her testimony, she "was strung out on crack" and unable to comply with her probation terms.

Defendant suffered from severe night terrors while living with his grandparents. According to Ms. Gore:

> [H]e would wake—well, not wake up, but he would be—the outbursts, the flailing of his arms, the slinging, the beating, walking to one end of the house to the other, trying—you could not wake him up. . . . He was not hearing a word you would say.
>
> . . . .

>This is—this is a whole other level. This is not I dreamed of a bad monster. This is inconsolable. You literally cannot bring him out of it.

At age eight, a doctor with Little River Medical Center assessed Defendant with ADHD and potential PTSD.

During middle school, Defendant frequently got into fights with other kids after they made fun of him for having drug-addicted parents. He was eventually expelled because of his conflicts with other students. Ms. Gore grew increasingly concerned with Defendant's conduct, testifying "his behavior was just more than what [she] was willing to allow into [her] family and home." His grandparents attempted to homeschool Defendant but were unable to do so because, per Ms. Gore, "[h]e was at that point just too out of hand." Ms. Gore suspected Defendant had begun abusing drugs: "I think that was probably originally when the drug use started because at that—he was in the 11, 12 year old age at that point." In fact, Defendant had started smoking marijuana at age nine and was abusing Xanax and drinking alcohol daily at age eleven. At age twelve, Defendant became sexually active. He was diagnosed with frontal lobe epilepsy and a secondary diagnosis of behavioral issues in this time frame, revealing that his night terrors were in fact frequent recurring nocturnal seizures that severely interfered with his ability to sleep.

Despite these difficulties, Ms. Gore and her parents "tried to give [Defendant] the most normal life—he and his sister, . . . because of the—just, you know, to

[Defendant's parents], they meant nothing. They were nothing to them." Unfortunately, Defendant's maternal relatives eventually grew unable to care for him; Defendant's grandmother suffered a stroke, his grandfather could not be at home due to work, and Ms. Gore "just lost the ability to influence him[.]" As a result, Defendant went to stay with his father—who had recently been released from prison. Their time together was short-lived, as his father was arrested again less than a year later. Defendant then spent some time with his mother in South Carolina, where he was cited for possession of marijuana at school. A psychosocial evaluation performed by the South Carolina Department of Justice following the citation revealed that Defendant had "borderline intellectual functioning" with an IQ of 79.

Defendant was influenced by his father's family on Savannah Road. One of his paternal aunts worked as a prostitute, and took Defendant with her to a motel where she met clients. That same aunt owned a trailer on Savannah Road where her boyfriend, who was also a crack addict, lived. Defendant and others in the neighborhood would hang out at the trailer and get high together. One of Defendant's friends was a cousin on his father's side, Brad Adams. Mr. Adams was at least ten years older than Defendant and Ms. Gore testified that "he was a mentor to [Defendant] . . . . [Defendant] looked up to him and wanted to be in that club [of criminals]." Defendant's mother echoed this description: "[Defendant] loved Brad. [Defendant]—I mean, he worshiped him. . . . [Defendant] loved him and would do

anything in the world for him." Mr. Adams was a poor role model for Defendant; he supplied alcohol, cocaine, opiates, methamphetamines, PCP, and heroin to Defendant, and was involved in numerous criminal schemes.

Defendant was diagnosed in 2014 with mild conduct disorder, severe cannabis use disorder, moderate alcohol use disorder, and sedative, hypnotic, or anxiolytic use disorder. Beginning in early 2016, Defendant's seizures grew increasingly severe and violent. An emergency room visit that January showed that Defendant was experiencing roughly six-to-ten seizures a night; two follow-ups the next month disclosed his seizures had increased to six-to-twelve per night, were uncontrolled, and were progressively worsening "possibl[y] due to PTSD."

### B. The Rape, Murder, and Defendant's Arrest

When Defendant was fifteen years old, Defendant took a family member's van to a local supermarket, broke into the building, and stole a large number of cigarettes. Local law enforcement responded to the building's alarm and identified Defendant as the perpetrator based on a security video. They received a separate call reporting the van as stolen. A deputy arrived on Savannah Road, took a statement, and stayed in the area to try and locate Defendant. Officers saw the van return to the neighborhood and made a traffic stop, only to discover that the driver was the owner. After she explained that she had retrieved her van from Defendant, law enforcement searched the vehicle and discovered the stolen cigarettes. They then filed a juvenile petition

and arranged a meeting between Defendant and a court counselor for 11 March 2016. **[Id.]** Shortly after the police had departed, one of Defendant's paternal aunts, Felicia Porter ("Ms. Porter"), called 911 to report that Defendant had returned to Savannah Road and was involved in a scuffle inside her house. In the days following the 911 call, Defendant reportedly said that he would "make that b**** [Ms. Porter] pay[.]"

On the morning of Defendant's scheduled meeting with the court counselor, Ms. Porter woke up in her home on Savannah Road around 6:00 a.m. to take her husband to work. She returned home around 9:00 a.m. and started browsing Facebook. Defendant began the day by smoking marijuana and snorting PCP. At 9:30 a.m., Ms. Porter's neighbor, John Cunningham, was outside trying to get his truck dislodged from a field when he saw Defendant walk down the street to Ms. Porter's residence. Defendant knocked on Ms. Porter's door and convinced her to come outside. When she came out of the house, Defendant raped her. He then beat her to death with a shovel and left her body in the woods nearby. Ms. Porter's body, later recovered by police, evinced numerous severe and traumatic injuries suffered during the attack, including a broken arm, the loss of all of her front teeth, and a multitude of lacerations and broken bones in her face. With his crimes completed, Defendant burned an article of Ms. Porter's clothing in a burn pile in the backyard before walking back by Mr. Cunningham at around 10:30 a.m. The two briefly talked about Defendant's upcoming court appointment and parted ways.

After Defendant left with his mother for his meeting with the court counselor, Ms. Porter's relative and neighbor, Bessie Porter, called Ms. Porter's residence on the telephone. When there was no answer, she called Mr. Cunningham, who also did not answer because he was outside working on his truck. Mr. Adams, Defendant's "mentor," lived with Bessie Porter and left her house to meet with Mr. Cunningham when he did not pick up the phone. After Mr. Adams helped Mr. Cunningham free his truck from the field, the two walked down to Ms. Porter's residence to check on her. They noticed several things amiss at the house, leading them to file a missing persons report later that afternoon. The local sheriff's department discovered Ms. Porter's body two days later, and the State Bureau of Investigation located the broken shovel used to kill Ms. Porter three days after that. DNA evidence from a rape kit and the underwear found on Ms. Porter's body would later identify Defendant as the perpetrator.

Defendant was interviewed in connection with the rape and murder on 12 March 2016 and denied any involvement. The following week, Defendant was admitted to a local hospital for a bout of uncontrolled seizures. He was transferred to UNC Memorial Hospital on 21 March for a four day stay, during which time his seizures were so severe that he broke his hospital bed. An MRI conducted by the hospital revealed "scarring" and "damage to [Defendant's] frontal lobe on the right

side" in the form of mesial temporal sclerosis,[1] possibly as the result of multiple head injuries dating back to the age of five. A hospital psychiatrist noted that Defendant's "mood liability and agitation are at least in part due to his frontal lobe seizures," while a pediatric neurologist urged Defendant's mother to seek psychological treatment for Defendant because his "severe oppositional behavior problem and agitation . . . is due to frequent partial epilepsy" and his "seizures are associated with psychiatric agitations . . . [and] significant behavioral changes." Defendant's discharge papers disclosed that his "frontal lobe epilepsy may affect [his] ability to regulate his emotions and prevent[] [him] from getting adequate sleep."

Defendant later admitted to his involvement in his aunt's murder in a police interview on 29 March 2016. More specifically, Defendant told law enforcement that he and Mr. Adams had gone to his aunt's house to try and recover a kilogram of heroine they had given to her husband; when they did not find the drugs, Mr. Adams killed and raped Ms. Porter. Defendant then gave another conflicting recitation of events in a subsequent interview wherein he asserted that there were no drugs involved and admitted to raping Ms. Porter while maintaining that Mr. Adams committed the murder.

---

[1] According to a forensic psychologist who testified as an expert at Defendant's sentencing hearing, a male's frontal lobes do not fully develop until age 25, and "are responsible for judgment . . . [,] the ability to make decisions . . . [,] plan, delay gratification, [and] regulate emotions." As a result, "adolescents really aren't capable of the same type of judgment [as adults]. Their impulse control, their judgment, their ability to think about alternatives is impaired."

Not long after these interviews, Defendant had a mental breakdown over what he had done and begged his mother to call the State Bureau of Investigation. He then met with an SBI investigator, confessed to the crimes, and was taken into custody.

## C. Defendant's Plea and Sentencing

Defendant was indicted by a grand jury in December 2016 on two counts of possession of stolen goods and one count each of breaking and entering, larceny after breaking and entering, larceny of a motor vehicle, first-degree rape, and first-degree murder. Defendant reached a plea agreement with the State whereby he pled guilty to rape and murder while the State dismissed all remaining charges. He also filed a motion to declare LWOP and the sentencing scheme found in N.C. Gen. Stat. § 15A-1340.19A unconstitutional as applied to him.

The trial court heard Defendant's motion at a four-day sentencing hearing beginning 18 February 2019. Defendant argued that, under *Roper v. Simmons*, 543 U.S. 551, 161 L. Ed. 2d 1 (2005), *Graham v. Florida*, 560 U.S. 48, 176 L. Ed. 2d 825 (2010), *Miller v. Alabama*, 567 U.S. 460, 183 L. Ed. 2d 407 (2012), and *Montgomery v. Louisiana*, ____ U.S. ____, 193 L. Ed. 2d 599 (2016), LWOP sentences for homicide are constitutional under the Eighth Amendment to the United States Constitution only when "a juvenile is permanently incorrigible, permanently depraved." As for Defendant's circumstance, his counsel contended that a showing of permanent incorrigibility could not be made and "ask[ed] that he be sentenced to life with the

10

possibility of parole, which, of course, doesn't mean he'll get paroled. It only means he would get a hearing in 25 years."

The trial court denied Defendant's motion and proceeded to sentencing. Defendant offered testimony from Ms. Gore, Defendant's mother, and a mitigation specialist consistent with the above recitation of the factual history. A forensic psychologist also testified to his assessment of Defendant's mental acuity, telling the trial court that Defendant tested with an IQ of 62 "in the extremely low range." Nonetheless, the psychologist testified that Defendant had improved significantly over his two-and-a-half years while in custody. When they first met, Defendant was "aggressive, agitated, [and] fidgety[;]" now, "he was much more calm. . . . He seemed to be invested in his schoolwork, and that was affirmed by the director of the [juvenile detention] facility." Defendant was no longer experiencing seizures, as "his medication compliance with anti-seizure convulsive medications ha[d] been quite effective." There was also "an opening up of [Defendant] talking more about his feelings, which is, again, a good prognostic sign[.]" When asked if he found that Defendant "has demonstrated ability to change[,]" he responded:

> I do. I do. Several factors there. I think . . . , first of all, he has accepted responsibility for his behavior. He expressed guilt for what he's done.
>
> The adolescent brain doesn't preclude a person from knowing . . . right from wrong, but it does influence their ability to make good decisions and not be under the influence of impulse and not considering consequences.

> But I strongly believe that [Defendant] has the potential to change.
>
> . . . .
>
> And so, this is a person who has never, ever had psychological interventions to amend or to correct some of the deficits that we see in [Defendant].

The psychologist also spoke to the impact of a LWOP sentence on Defendant's development:

> [W]hat I am concerned about in a case like [Defendant's] is that if you take away that potential or that hope for possible release some day [it] really is tantamount to a death sentence.
>
> . . . .
>
> [G]iving him the option for parole places the onus of [Defendant]'s behavior on him directly.
>
> . . . .
>
> If [Defendant] does well, that greatly enhances the chance that he may be released some day. If he screws up, his sentence is going to be continued and he's not going to have that option.
>
> So it really places the responsibility for what happens to [Defendant] on [Defendant], which I think is the appropriate thing to do in [Defendant]'s case but most anybody in his situation.

The trial court also received documentary evidence regarding Defendant's homelife and upbringing, medical conditions and treatment, and development and infractions while in detention. Although Defendant had seen periods of improvement in the custody of the Division of Juvenile Justice, a recent Court Behavior Report disclosed that "[s]ince [Defendant]'s initial admission in March 2016, his behavior has gone through several cycles of weeks-months of appropriate behaviors and several weeks-months of negative behaviors." For example, Defendant and another juvenile mounted an unsuccessful escape attempt in May 2018 but subsequently showed improved behavior over the seven months prior to his sentencing.

In its closing argument, the State contended that Defendant presented the "exceedingly rare . . . situation where a juvenile would get life without [parole] . . . . This is that rare case. . . . And the only real appropriate sentence to this [case] would be . . . life without [parole]." In the event the trial court disagreed, it asked that "the Court . . . put a sentence on the rape, where he can be held accountable for the rape, and then the murder at the end of the rape[.] . . . [W]e'd ask you to do that, stack them. And then that covers everybody." Defendant's counsel argued to the contrary, asserting that "[t]his is a case of transient immaturity" such that a LWOP sentence would be unconstitutional. Defendant argued that a stacked

sentence would likewise be a cruel and unusual punishment as "a de facto life sentence in and of itself."[2]

The trial court announced Defendant's sentences from the bench on 21 February 2019, ordering Defendant serve 240 to 348 months for rape—the maximum allowable in the presumptive range based on Defendant's prior record level of I. N.C. Gen. Stat. § 15A-1340.17(c) (2019). It then sentenced Defendant on first degree murder under N.C. Gen. Stat. § 15A-1340.19A by making the following findings of fact:

> The defendant, at the time of the offense and leading up to the time of the plea, exhibited numerous signs of developmental immaturity. The immaturity was exacerbated by low levels of structure, supervision, and discipline.
>
> The defendant's father has been incarcerated for most of the life of the defendant.
>
> The defendant's mother has struggled with substance abuse, periods of incarceration, and has not been present for the vast majority of defendant's life.
>
> The defendant has been passed to one family member to another for basic living and custodial purposes and never received any parental leadership, guidance, or structure.
>
> Additionally, the defendant suffers from chronic frontal lobe epilepsy which went untreated for years causing daily seizures. Such seizures caused frontal lobe brain injury to the defendant in addition to chronic sleep deprivation.

---

[2] Although the transcript shows Defendant's counsel mistakenly described "concurrent" sentences for rape and murder as a *de facto* LWOP sentence, he later made clear that his argument was aimed at consecutive sentences.

The defendant was subject[ed] in his transient living conditions to criminal activity, violence, and rampant substance abuse.

In fact, his own substance abuse started at approximately age nine . . . .

The defendant's only role model was a negative role model, Brad Adams, an individual with a horrible criminal history and habitual felon. The defendant looked up to Brad Adams, who was ten years senior to the defendant in age.

The defendant had a limited ability to fully appreciate the risks and consequences of his conduct based upon the totality of his poor upbringing.

. . . .

It is clear that his I.Q. and educational levels appear at the low range of average to below average.

. . . .

And the defendant was subjected to an overall environment of drugs and other criminal activity.

Based upon testing and other professional evaluations, it is clear that the defendant would benefit from education, counseling, and substance abuse treatment while in confinement and incarceration.

. . . .

Additionally, although it has taken some time for him to do so, . . . the defendant[] has recently demonstrated some increased maturity while being incarcerated, and that he did agree to enter this plea . . . .

> Therefore, with regard to conclusions of law, the evidence supports the statutory criteria and those contained in *Miller v. Alabama*, and for the sentence on the first degree murder, he is to receive life with the possibility of parole after 25 years minimum.
>
> That sentence is to run consecutive to the rape sentence[.]

Defendant's counsel renewed his constitutional objection and gave oral notice of appeal. The trial court entered its written judgments and order that Defendant submit to lifetime SBM later that day. Defendant filed written notice of appeal from the SBM order on 14 March 2019.

## II. <u>ANALYSIS</u>

Defendant argues that the trial court erred in imposing consecutive sentences for rape and first-degree murder because: (1) consecutive sentences are not permissible under Defendant's interpretation of the *Miller*-fix statutes; and (2) the sentences, which place Defendant's earliest possible parole eligibility at 45 years imprisonment and age 60, constitute a *de facto* LWOP sentence in violation of the Eighth Amendment and Article I, Section 27 of the North Carolina Constitution. Defendant further contends that the trial court erred in failing to hold an SBM hearing. I first address Defendant's sentencing arguments, followed by the trial court's imposition of SBM.

### A. Statutory Construction of Miller-*Fix Statutes*

This Court reviews questions of statutory construction *de novo*. *State v. Hayes*, 248 N.C. App. 414, 415, 788 S.E.2d 651, 652 (2016). In interpreting a statute, we must "determine the meaning that the legislature intended upon the statute's enactment." *State v. Rieger*, ___ N.C. App. ___, ___, 833 S.E.2d 699, 700-01 (2019) (citation and quotation marks omitted). "If the statutory language is clear and unambiguous, the court eschews statutory construction in favor of giving the words their plain and definite meaning." *State v. Beck*, 359 N.C. 611, 614, 614 S.E.2d 274, 277 (2005) (citation omitted). Resort may be had, however, to the title of the act in question; as our Supreme Court has held, "even when the language of a statute is plain, 'the title of an act should be considered in ascertaining the intent of the legislature.'" *Ray v. N.C. Dep't of Transp.*, 366 N.C. 1, 8, 727 S.E.2d 675, 681 (2012) (quoting *Smith Chapel Baptist Church v. City of Durham*, 350 N.C. 805, 812, 517 S.E.2d 874, 879 (1999)).

The imposition of consecutive sentences is generally controlled by N.C. Gen. Stat. § 15A-1354, which provides, "[w]hen multiple sentences of imprisonment are imposed on a person at the same time . . . the sentences may run either concurrently or consecutively, as determined by the court." N.C. Gen. Stat. § 15A-1354(a) (2019). As for the *Miller*-fix statutes, N.C. Gen. Stat. § 15A-1340.19A states "a defendant who is convicted of first degree murder, and who was under the age of 18 at the time of the offense, shall be sentenced in accordance with this Part. For the purposes of this

Part, 'life imprisonment with parole' shall mean that the defendant shall serve a minimum of 25 years imprisonment prior to becoming eligible for parole." Defendant argues that the statutory definition of life with parole, together with both the requirement that a juvenile convicted of homicide be "sentenced in accordance with this Part" and the absence of any reference to consecutive sentences, compels the conclusion that consecutive sentences placing parole eligibility outside 25 years for a juvenile homicide offender who has not been determined incorrigible or irreparably corrupt are statutorily prohibited. Defendant points to no specific language as ambiguous, asserting instead that "the plain language indicates juvenile offenders convicted of first-degree murder—without regard to other counts—who are found to be parole eligible shall be eligible for parole after twenty-five years." Though I agree with Defendant that the statutory language is unambiguous and requires parole eligibility *after* 25 years, I disagree that it compels sentences with eligibility *at* 25 years and thus prohibits the imposition of consecutive sentences in this case.[3]

As recounted above, a juvenile convicted of homicide "shall be sentenced in accordance with" the *Miller*-fix statutes. N.C. Gen. Stat. § 15A-1340.19A. This plain language is not exclusive, as it is entirely possible for a sentence to be "in accordance with" multiple applicable statutory parts. Thus, as a statutory matter, the trial court

---

[3] Because Defendant was sentenced pursuant to N.C. Gen. Stat. § 15A-1340.19B(a)(2), I do not address whether consecutive sentences are statutorily permissible for juveniles convicted of first degree murder under the felony murder rule and sentenced pursuant to N.C. Gen. Stat. § 15A-1340.19B(a)(1).

may sentence a defendant for murder under the *Miller*-fix statutes to life with parole and run that punishment consecutively to another sentence under N.C. Gen. Stat. § 15A-1354(a) so long as doing so does not otherwise conflict with the provisions of the *Miller*-fix statutes. Though these statutes overlap, this does not compel the total rejection of N.C. Gen. Stat. § 15A-1354(a) as a more general statute. To the contrary, "if 'there is one statute dealing with a subject in general and comprehensive terms, and another dealing with a part of the same subject in a more minute and definite way, *the two should be read together and harmonized*[.'] " *LexisNexis Risk Data Mgmt., Inc. v. N.C. Admin. Office of Courts*, 368 N.C. 180, 186, 775 S.E.2d 651, 655 (2015) (emphasis added) (quoting *Nat'l Food Stores v. N.C. Bd. of Alcoholic Control*, 268 N.C. 624, 628-29, 151 S.E.2d 582, 586 (1966)) (additional citations omitted). It is only when there is a " [']necessary repugnancy between them [that] the special statute . . . will prevail over the general statute[.]' " *Id.* (quoting *Nat'l Food Stores*, 268 N.C. at 629, 151 S.E.2d at 586) (additional citations omitted).

The applicable statutory definition of "life imprisonment with parole," N.C. Gen. Stat. § 15A-1340.19A, does not create such a "necessary repugnancy." *LexisNexis*, 368 N.C. at 186, 775 S.E.2d at 655 (citations and quotation marks omitted). That definition provides only that a defendant "serve a *minimum* of 25 years imprisonment prior to becoming eligible for parole." N.C. Gen. Stat. § 15A-1340.19A (emphasis added). Applying the statute's plain language, a punishment

pushing a defendant's ultimate eligibility for parole beyond 25 years due to consecutive sentencing does not contravene the minimum provided by the definition. To the contrary, the holding requested by Defendant—that the definition of "life imprisonment with parole" compels sentences allowing for parole eligibility *at* 25 years—would impermissibly deviate from the unambiguous statutory language. *See State v. Jackson*, 353 N.C. 495, 501, 546 S.E.2d 570, 574 (2001) ("When the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must give the statute its plain and definite meaning, and are without power to interpolate, or superimpose, provisions and limitations not contained therein." (citation and quotation marks omitted)).

This holding is consistent with our Supreme Court's treatment of N.C. Gen. Stat. § 15A-1354(a) in *State v. Ysaguire*, 309 N.C. 780, 309 S.E.2d 436 (1983), where the defendant argued that consecutive sentences pursuant to N.C. Gen. Stat. § 15A-1354(a) were not permitted under the Fair Sentencing Act because "the General Assembly did not address the issue of consecutive sentences in the . . . Act[.]" 309 N.C. at 785, 309 S.E.2d at 440. The Supreme Court rejected the argument, stating that "[s]ince that statute was in effect when the legislature enacted the Fair Sentencing Act, the legislature by leaving it substantially intact must have intended that the sentencing judge retain the discretion to impose sentences consecutively or

concurrently." *Id.* This was so even though such discretion seemingly ran contrary

to the legislative purposes behind the Fair Sentencing Act:

> Leaving sentencing judges with unbridled discretion on the matter of whether to run multiple sentences concurrently or consecutively conflicts with the general theory of uniformity sought by fair sentencing. Nevertheless, our legislature, in espousing both the spirit and the letter of fair sentencing in North Carolina, elected to incorporate the freedom for judges to impose consecutive sentences. Since that is the prerogative of the legislature, we find nothing inherent in consecutive sentencing which violates our Fair Sentencing Act.

*Id.*

I also do not agree with Defendant's argument that the title of the act enacting

the *Miller*-fix statutes discloses an intention to prohibit consecutive sentences and

require a punishment that provides parole eligibility at 25 years. The legislative title

used in this case—"An Act to Amend the State Sentencing Laws to Comply with the

United States Supreme Court Decision in *Miller v. Alabama*"—does not disclose an

intention to prohibit consecutive sentences or require them to provide parole

eligibility at 25 years through imposition of concurrent sentences only. 2012 N.C.

Sess. Laws 713, 713. As this Court recently recognized in *Kelliher*, the statutory

definition of "life imprisonment with parole" reflects "that our General Assembly has

determined parole eligibility at 25 years for multiple offenses sanctionable by life

with parole is not so excessive as to run afoul of *Miller*." ___ N.C. App. at ___, 849

S.E.2d at 351. This does not mean, however, that sentences placing parole eligibility

at 25 years is the sole constitutionally permissible punishment. In other words, the enabling act's title simply reveals that the General Assembly considered parole eligibility after 25 years to be *a,* but not necessarily the *only*, constitutional punishment allowed by *Miller*. Since "the title given to a particular statutory provision is not controlling," *State v. Fletcher*, 370 N.C. 313, 328, 807 S.E.2d 528, 539 (2017) (citation omitted), and the plain language of the *Miller*-fix statute does not disclose an intention to prohibit consecutive sentences for juveniles subject to *Miller*'s protections, I agree with the majority that the trial court was statutorily empowered to impose consecutive sentences in its discretion.

### B. Defendant's Constitutional Argument

In *Kelliher*, this Court addressed whether *de facto* LWOP sentences are: (1) the equivalent of *de jure* LWOP sentences for juvenile sentencing and constitutional purposes; and (2) cognizable in the form of lengthy aggregated, consecutive sentences.[4] We joined the majority of jurisdictions[5] by answering both questions in

---

[4] Though our Supreme Court has stayed *Kelliher*, I nonetheless find its reasoning persuasive in resolving this appeal.

[5] The State argues in its brief in this appeal that jurisdictions are "essentially evenly split" on whether *de facto* LWOP sentences are subject to *Graham*'s and *Miller*'s constitutional protections based on a review of cases conducted by the South Carolina Supreme Court in *State v. Slocumb*, 827 S.E.2d 148, 156 n.16 (S.C. 2019). My review of those same cases, with additional research, does not support this contention. For example, *Slocumb* did not list Iowa as a jurisdiction that bars *de facto* LWOP sentences under the United States Constitution, citing *State v. Null*, 836 N.W.2d 41, 76 (Iowa 2013) (holding a *de facto* LWOP sentence was subject to *Miller* protections under the Iowa state constitution rather than the federal constitution). However, the Iowa Supreme Court decided *State v. Ragland*, 836 N.W.2d 107 (Iowa 2013), the same day as *Null*, and plainly held that a life sentence with parole eligibility after 60 years was a "cruel and unusual punishment under the Eighth Amendment

the affirmative before holding that a defendant's consecutive sentences of life with parole—which placed parole eligibility at 50 years imprisonment and age 67—was an unconstitutional *de facto* LWOP sentence under the Eighth Amendment and Article I, Section 27 of the North Carolina Constitution. Although Defendant's aggregate punishment in this case differs from the one imposed in *Kelliher*, I would nonetheless

to the United States Constitution *and* article I, section 17 of the Iowa Constitution." 836 N.W.2d at 122 (emphasis added). *Slocumb* treated Missouri similarly, listing that state among those that do not recognize *de facto* LWOP sentences based on *Willbanks v. Mo. Dep't of Corr.*, 522 S.W.3d 238 (Mo. 2017) (en banc); however, Missouri's Supreme Court issued an opinion on the same day as *Willbanks* holding a *de facto* LWOP sentence *is* cognizable so long as it is not the result of an aggregation of lesser sentences. *State ex rel. Carr v. Wallace*, 527 S.W.3d 55, 61 n.7 (Mo. 2017). Likewise, *Slocumb* included Illinois among the states that did not recognize *de facto* LWOP sentences based on an Illinois intermediate court's decision from 2015 despite also recognizing that Illinois's Supreme Court held a *de facto* LWOP sentence violated the Eighth Amendment the following year. *Compare People v. Cavazos*, 40 N.E.3d 118, 139 (Ill. App. Ct. 2015) (holding *Miller* does not apply to term-of-years sentences), *with People v. Reyes*, 63 N.E.3d 884, 888 (Ill. 2016) ("[S]entencing a juvenile to a mandatory term of years that is the functional equivalent of life without the possibility of parole constitutes cruel and unusual punishment in violation of the eighth amendment."). *Slocumb* stated elsewhere that Louisiana does not recognize *de facto* LWOP sentences as violating *Graham* or *Miller* based on a 2013 Louisiana Supreme Court decision, *State v. Brown*, 118 So.3d 332 (La. 2013), but failed to cite a later case from that court that plainly held *de facto* LWOP sentences are "illegal" under *Graham*. *State ex rel. Morgan*, 217 So.3d 266, 271 (La. 2016). I also note that at least one state identified in *Slocumb* as not recognizing *de facto* LWOP sentences has since done so. *See White v. Premo*, 443 P.3d 597, 604-05 (Or. 2019) (holding juvenile's 800-month sentence for murder with parole eligibility at 54 years was "sufficiently lengthy" to require *Miller* protections). Indeed, one state has applied *Miller* to a *de facto* LWOP sentence for the first time since *Kelliher*. *See Williams v. State*, ___ P.3d ___, 2020 WL 5996442, *13 (Kan. Ct. App. Oct. 9, 2020) ("[W]e hold the constitutional protections afforded under *Miller* are triggered when a juvenile convicted of premeditated first-degree murder is subject to a sentence of a term of years that is the functional equivalent to a sentence of life without parole."). *Slocumb*'s tabulation further included multiple unpublished (and thus non-precedential) opinions from intermediate courts. Finally, *Slocumb*'s statement was not limited to state courts, and included federal courts that considered *de facto* LWOP sentences in a distinguishably different, albeit related, legal context. *See Kelliher*, ___ N.C. App. at ___, 849 S.E.2d at 347-48 (distinguishing the federal circuit courts' treatment of *Roper*, *Graham*, *Miller*, and *Montgomery* under federal habeas review from the questions presented to this Court). In sum, my independent review of the pertinent case law from around the country discloses that a clear majority of courts have recognized *de facto* LWOP sentences as unconstitutional when imposed on juveniles who have not been deemed incorrigible or irreparably corrupt.

hold that Defendant's imprisonment for a minimum of 45 years and earliest possible release at age 60 still presents a *de facto* LWOP sentence.

## 1. *Kelliher*'s Analytical Principles

In this Court's analysis in *Kelliher*, we reviewed decisions from the United States Supreme Court addressing juvenile sentencing: *Roper v. Simmons*, 543 U.S. 551, 161 L. Ed. 2d 1 (2005), *Graham v. Florida*, 560 U.S. 48, 176 L. Ed. 2d 825 (2010), *Miller v. Alabama*, 567 U.S. 460, 183 L. Ed. 2d 407 (2012), and *Montgomery v. Louisiana*, ____ U.S. ____, 193 L. Ed. 2d 599 (2016). Several principles from those cases apply with equal force in this case: (1) "juveniles are of a special character for the purposes of the Eighth Amendment," *Kelliher*, ___ N.C. App. at ___, 849 S.E.2d at 340 (discussing *Roper*), and are categorically less culpable for their crimes because of their "immaturity, vulnerability to influence and lack of control, and malleability," *id.* at ___, 849 S.E.2d at 343 (citing *Miller*, 567 U.S. at 471, 183 L. Ed. 2d at 418-19); (2) this diminished culpability undercuts the punishment justifications for the harshest sentences, *see id.* at ___, 849 S.E.2d at 343 (discussing *Miller*'s recognition that *Graham* analogized LWOP sentences and the death penalty); (3) "juvenile homicide offenders who are neither incorrigible nor irreparably corrupt[] are—like other juvenile offenders—so distinct in their immaturity, vulnerability, and malleability as to be outside the realm of LWOP sentences under the Eighth Amendment," *id.* at ___, 849 S.E.2d at 344 (summarizing *Montgomery*); and (4) it is

24

unconstitutional to impose a LWOP sentence that denies a juvenile who has not been determined incorrigible or irreparably corrupt "a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," and provides "no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope." *Id.* at ___, 849 S.E.2d at 344 (citations and quotations omitted).

*Kelliher* relied on the above precepts to hold *de facto* LWOP sentences—expressed as either a singular sentence or aggregated consecutive sentences—are subject to the constitutional protections of *Miller* and *Graham*. *Id.* at ___, 849 S.E.2d at 352. In applying that holding to the defendant's case, we noted that, although "the task of demarcating the bounds of a *de facto* LWOP sentence may be difficult, the task is not impossible." *Id.* at ___, 849 S.E.2d at 350. This Court then looked to approaches employed by other jurisdictions and the North Carolina Constitution's enumeration of inalienable rights before holding that the defendant's 50-year sentence and earliest opportunity for release at age 67 was unconstitutional. *Id.* I would apply that process to determine whether the sentence involved in this case constitutes an unconstitutional *de facto* LWOP sentence.

## 2. Is Defendant's Sentence an Unconstitutional *De Facto* LWOP Sentence

Different jurisdictions have employed different methods of identifying *de facto* LWOP sentences. *See Carter v. State*, 192 A.3d 695, 727-30 (Md. 2018) (reviewing five different means courts have used to discern *de facto* LWOP sentences). As this

Court observed in *Kelliher*, "many of them have found such sentences to exist when release . . . is only available after roughly 50 years, and sometimes less." ___ N.C. App. at ___, 849 S.E.2d at 350. *See also Carter*, 192 A.3d at 729 ("Many decisions that attempt to identify when a specific term of years without eligibility for parole crosses the line into a life sentence for purposes of the Eighth Amendment appear to cluster *under* the 50-year mark." (emphasis added)). We also found relevant the fact that our State Constitution lists the "enjoyment of the fruits of [one's] own labor," alongside "life, liberty . . . and the pursuit of happiness" as "inalienable rights[,]" N.C. Const. Art I, § 1, suggesting that other courts' use of retirement age and respect for " [']the chance to rejoin society in qualitative terms['] " was pertinent to identifying *de facto* LWOP sentences. *Kelliher*, ___ N.C. App. at ___, 849 S.E.2d at 350 (quoting *People v. Contreras*, 411 P.3d 445, 454 (Cal. 2018)). *See also Casiano v. Comm'r of Corr.*, 115 A.3d 1031, 1046 (Conn. 2015) (holding a 50 year *de facto* LWOP sentence violated the Eighth Amendment in part because "[a] juvenile offender's release when he is in his late sixties comes at an age when the law presumes that he no longer has productive employment prospects"); *Carter*, 192 A.3d at 734 (holding parole eligibility after 50 years was a *de facto* LWOP sentence in part because "the eligibility date will be later than a typical retirement date for someone of [the defendant's] age").

Defendant's sentence constitutes a *de facto* LWOP sentence under the above considerations even though it is factually distinct from the punishment imposed in

*Kelliher*.  Assuming that Defendant is eligible at the earliest possible moment—at age 60 after serving 45 years—similar punishments have elsewhere been held to constitute *de facto* LWOP sentence.  *See Bear Cloud v. State*, 334 P.3d 132, 142 (Wyo. 2014) (holding a sentence of just over 45 years and release at age 61 was a *de facto* LWOP sentence).  Such a "geriatric release . . . does not provide a 'meaningful opportunity' to demonstrate the 'maturity and rehabilitation' required to obtain release and reenter society as required by *Graham*."  *State v. Null*, 836 N.W.2d 41, 71 (Iowa 2013) (quoting *Graham*, 560 U.S. at 75, 176 L. Ed. 2d at 845-46). As we quoted favorably in *Kelliher*:

> [T]he language of *Graham* suggests that the high court envisioned more than the mere act of release or a de minimis quantum of time outside of prison.  *Graham* spoke of the chance to rejoin society in qualitative terms—"the rehabilitative ideal" ([*Graham*] at 130 S. Ct. 2011)—that contemplate a sufficient period to achieve reintegration as a productive and respected member of the citizenry.  The "chance for reconciliation with society" (id. at 130 S. Ct. 2011), "the right to reenter the community" (id. at 130 S. Ct. 2011), and the opportunity to reclaim one's "value and place in society" (*ibid*.) all indicate concern for a measure of belonging and redemption that goes beyond mere freedom from confinement.   . . . Confinement with no possibility of release until age 66 or age 74 seems unlikely to allow for the reintegration that *Graham* contemplates.

*Contreras*, 411 P.3d at 454.

    As for whether Defendant's sentence allows him "to reclaim one's 'value and place in society,' " *id.* (quoting Graham, 560 U.S. at 74, 176 L. Ed. 2d at 845), the fact

that Defendant will be released a few years before reaching retirement age[6] does not sway me from concluding otherwise; in actuality, that fact bolsters declaring Defendant's sentence unconstitutional when the realities facing juvenile defendants upon release from lengthy sentences are taken into account.

In arguing that Defendant's sentence does offer a meaningful opportunity for release, the State quotes *State v. Smith*, 892 N.W.2d 52 (Neb. 2017), in which the Supreme Court of Nebraska stated, "because [the defendant] will be parole eligible at age 62, we do not agree that his sentence represents a geriatric release or equates to no chance for fulfillment outside prison walls, because in today's society, it is not unusual for people to work well into their seventies and have a meaningful life well beyond age 62 or even at age 77." 892 N.W.2d at 66. What the Nebraska court—and the majority in this case—failed to consider, however, were the realities facing those released from prison, choosing instead treating a juvenile released after decades in prison as if he were an otherwise ordinary member of society.[7] As in *Kelliher*, this

---

[6] While the Social Security Act defines retirement age as falling between age 60 and 67, depending on the circumstances, 42 U.S.C. § 416(l), a panel of the Third Circuit observed in a *de facto* LWOP case that "by all accounts, the national age of retirement to date is between sixty-two and sixty-seven inclusive." *United States v. Grant*, 887 F.3d 131,151, *reh'g en banc granted, opinion vacated*, 905 F.3d 285 (3rd Cir. 2018)

[7] I do not rely on estimations of life expectancy in reaching my determination that Defendant's punishment is a *de facto* LWOP sentence, but observe that other courts have recognized that data indicates "the life expectancy of incarcerated youthful offenders is significantly reduced compared to that of the general population." *Bear Cloud*, 334 P.3d at 142 (footnote omitted). *See also Casiano*, 115 A.3d at 1046 (reviewing several statistical analyses and judicial decisions recognizing a "reduction in life expectancy due to the impact of spending the vast majority of one's life in prison" (citations omitted)).

"ignore[s] *Graham*'s own caution against denying the true reality of the actual punishment imposed on a juvenile when determining whether it violates the Eighth Amendment." ___ N.C. App. at ___, 849 S.E.2d at 346. *See also Graham*, 560 U.S. at 70-71, 176 L. Ed. 2d at 843 ("A 16-year-old and a 75-year-old each sentenced to life without parole receive the same punishment in name only. *This reality cannot be ignored.*" (emphasis added)).

It is both a matter of common sense and beyond any serious dispute to state that those who have served lengthy active sentences face markedly diminished job prospects compared to the rest of the general public.[8] When that is taken into account, Defendant's release offers a mere "de minimis quantum of time out of prison[,]" *Contreras*, 411 P.3d at 454, that does not afford him a meaningful opportunity to pursue his "inalienable right[] . . . to enjoy the fruits of [his] labor." N.C. Const. Art. I, § 1. As the Supreme Court of Connecticut observed, "[t]he United States Supreme Court viewed the concept of 'life' in *Miller* and *Graham* more broadly

---

[8] According to an analysis by the North Carolina Department of Commerce's Labor and Economic Analysis Division, previously incarcerated individuals "struggle with low rates of employment and poor wage earnings compared to the rest of the population." Andrew Berger-Gross, *The State of Reentry: An Update on Former Offenders in North Carolina's Labor Market*, The LEAD Feed (Oct. 29, 2019), https://www.nccommerce.com/blog/2019/10/29/state-reentry-update-former-offenders-north-carolina's-labor-market. The analysis, which looked at data from 2017 as the most recent available, showed that "[r]ates of employment and wage earnings among the formerly incarcerated remain relatively low compared to the rest of the population. Sixty-one percent of North Carolinians were employed at some point during 2017, compared to 45% of former prisoners." *Id.* (citation omitted). Employment amongst the previously incarcerated has declined in North Carolina: "In the late 1990s, it was relatively normal for people to find work after exiting prison . . . . Now, only a minority of former prisoners find work after release, despite record-high employer demand for labor in our state." *Id.* Those that found employment in their first year of release earned a real median annual wage of $5,912 compared to $27,934 of all workers in North Carolina. *Id.*

than biological survival; it implicitly endorsed the notion that an individual is effectively incarcerated for 'life' if he will have no opportunity to truly reenter society or have any meaningful life outside of prison." *Casiano*, 115 A.3d at 1047 (citing *Graham*, 560 U.S. at 75, 176 L. Ed. 2d at 846) (additional citations omitted). A release from prison with the statistically unlikely chance to contribute to society for a scant few years does not comport with this application of Eighth Amendment principles, as it still places a juvenile who has not been deemed incorrigible or irreparably corrupt:

> behind bars before he has had the chance to exercise the rights and responsibilities of adulthood, such as establishing a career . . . [or] raising a family . . . . Even assuming the juvenile offender does live to be released, after a half century of incarceration, he will have irreparably lost the opportunity to engage meaningfully in many of these activities and will be left with seriously diminished prospects for his quality of life for the few years he has left.

*Id.*

I acknowledge that other courts have reached different conclusions. *See, e.g., Ira v. Janecka*, 419 P.3d 161, 170 (N.M. 2018) (holding a sentence of almost 46 years was not an unconstitutional *de facto* LWOP sentence). This appears inevitable when sentences like Defendant's fall near "the outer limit of what is constitutionally acceptable." *Id.* (citation omitted). I am guided, however, by the concerns in *Kelliher* and its application of the Eighth Amendment and the North Carolina Constitution,

and would hold that Defendant's punishment in this case constitutes an unconstitutional *de facto* LWOP sentence.

The majority declines to apply or discuss *Kelliher*'s reasoning because: (1) "*Miller* has never held as being unconstitutional a life *with* parole sentence imposed on a defendant who commits a murder when he was a minor[;]" and (2) the life expectancy and mortality table found in N.C. Gen. Stat. § 8-46 (2019) lists a 15-year old's life expectancy as 61.7 years. In making its first point, the majority does not recognize or address the numerous decisions from state appellate courts—expressly relied upon in *Kelliher*—that have held *Miller* does apply to juveniles convicted of homicides and sentenced to terms of imprisonment that are the functional equivalent of a LWOP punishment. *See, Kelliher*, ___ N.C. App. at ___ n 11, 849 S.E.2d at 345 n 11 (citing 17 states whose appellate courts have recognized lengthy term-of-years sentences as *de facto* LWOP sentences subject to the constitutional protections of *Roper*, *Graham*, and/or *Miller*, including eleven decisions with holdings that directly applied those protections to juveniles convicted of homicide or would apply them to such cases).

To the extent the statutory mortality table found in N.C. Gen. Stat. § 8-46, which was not relied upon by the State at resentencing or on appeal, applies to the constitutional question before this Court, that statute by its very terms provides that it "*shall* be received . . . *with other evidence as to the health, constitution and habits*

*of the person*[.]" (emphasis added). Thus, the life expectancy "table . . . is not conclusive, but only evidentiary," *Young v. E. A. Wood & Co.*, 196 N.C. 435, ___, 146 S.E.2d 70, 72 (1929) (construing a predecessor statute), and "life expectancy is determined from evidence of the plaintiff's health, constitution, habits, and the like, *as well as* from [the statutory] mortuary tables." *Wooten v. Warren by Gilmer*, 117 N.C. App. 350, 259, 451 S.E.2d 342, 359 (emphasis added) (citation omitted). The 61.7 year life expectancy for 15-year-old minors found in the statute certainly are not conclusive in light of Defendant's "health, constitution, habits, and the like." *Id.* For example—and setting aside any impact that a minimum of 45 years of imprisonment will have on Defendant—it is uncontroverted that Defendant suffers from mesial temporal sclerosis, epilepsy, PTSD, has a history of head injuries dating back to infancy, and years-long history of heavy, and varied drug abuse dating back to age eleven. The statutory life expectancy and mortality table *requires* consideration of this evidence alongside the tables themselves, N.C. Gen. Stat. § 8-46, and the majority's reliance on the lone 61.7 number provided by the statute does not change the "reality" of Defendant's punishment. *Cf. Graham*, 560 U.S. at 70-71, 176 L. Ed. 2d at 843.

## II. <u>CONCLUSION</u>

As this Court said in *Kelliher*, the application of the Eighth Amendment and the North Carolina Constitution to juvenile sentencing presents myriad complexities.

___ N.C. App. at ___, 849 S.E.2d at 351-52.  Nevertheless, "[t]his Court's duty is to uphold the federal and state Constitutions irrespective of these difficulties."  *Id.* at ___, 849 S.E.2d at 352.  Looking to the general principles set forth in *Roper*, *Graham*, *Miller*, and *Montgomery*, as well as to their application in *Kelliher*, I would hold that Defendant's consecutive sentences constitute an unconstitutional *de facto* LWOP punishment. For these reasons, I respectfully dissent from the majority's holding to the contrary.